```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                      NORTHERN DIVISION

 3   IN RE SUBPOENAS TO PETER ANGELOS  )
     LAW, P.C., in IN RE BESTWALL, LLC,)
 4   CASE NO. 3:17-BK-31795-LTB,       )
     PENDING IN THE BANKRUPTCY COURT   ) CIVIL NO.:
 5   FOR THE WESTERN DISTRICT OF       ) 1:21-cv-03257-SAG
     NORTH CAROLINA                    )
 6                                     )
     _____ )
 7

 8                                      Baltimore, Maryland
                                        March 29, 2022
 9                                      10:00 a.m.

10                   TRANSCRIPT OF PROCEEDINGS
                         MOTIONS HEARING
11         BEFORE THE HONORABLE STEPHANIE A. GALLGHER
                        Courtroom 7C
12

13   On Behalf of Peter Angelos Law, P.C.:

14        Thomas W. Waldrep, Esquire
            Waldrep Wall Babcock and Bailey
15
          E. David Hoskins, Esquire
16          The Law Offices of E. David Hoskins LLC

17   On Behalf of Bestwall, LLC:

18        Charles N. Curlett, Jr., Esquire
          G. Adam Ruther, Esquire
19          Rosenberg Martin Greenberg, LLP

20        Richard Worf, Esquire
            Robinson Bradshaw and Hinson PA
21

22        Proceedings recorded by mechanical stenography, transcript
     produced by computer.
23   _____

24                   Patricia G. Mitchell, RMR, CRR
                     Federal Official Court Reporter
25                   101 W. Lombard Street, 4th Floor
                        Baltimore, Maryland 21201
```

```
 1                      P R O C E E D I N G S

 2        (9:58 a.m.)

 3              THE COURT:  Good morning.  Please be seated.

 4              THE CLERK:  The matter now pending before this Court

 5    is Civil Docket Number 21-CV-3257-SAG, In Re Subpoenas to Peter

 6    Angelos Law, PC, versus Bestwall, LLC.  This matter now comes

 7    before the Court for the purpose of a motions hearing.

 8              Counsel for the plaintiffs, please introduce yourself

 9    for the record.

10              MR. WALDREP:  Good morning, Your Honor.  My name is

11    Tom Waldrep.  I'm with the Waldrep Wall law firm from Winston

12    Salem, North Carolina.

13              THE COURT:  Welcome.

14              MR. WALDREP:  With me is David Hoskins of the

15    Baltimore bar.

16              THE COURT:  Thank you.  Good morning to both of

17    you.

18              THE CLERK:  Thank you.  Counsel for the defendants.

19              MR. CURLETT:  Good morning, Your Honor.  Charles

20    Curlett of Rosenberg Martin & Greenberg.

21              MR. WORF:  Good morning, Your Honor.  Richard Worf

22    from Robinson Bradshaw in Charlotte, North Carolina for

23    Bestwall.

24              MR. RUTHER:  Good morning, Your Honor.  Adam Ruther

25    also of Rosenberg Martin Greenberg.
```

| | |
|---|---|
| 1 | THE COURT:  Good morning to all of you.  The rules in |
| 2 | terms of masking are that people who are going to be speaking |
| 3 | are permitted to remove your mask while you are speaking. |
| 4 | Otherwise, everyone should remain masked -- and only if you're |
| 5 | fully vaccinated may you remove your mask.  If you are |
| 6 | unvaccinated, you should leave it on. |
| 7 | So we are here obviously on the issue of the motion |
| 8 | to quash or modify the subpoenas.  I have prepared an outline |
| 9 | of a series of questions that I had after reading through the |
| 10 | parties' extensive briefing.  It seems to me the most efficient |
| 11 | way to conduct the hearing would be for me to sort of run |
| 12 | through my questions in various areas and then get responses |
| 13 | from the parties, and then possibly at the end if there's |
| 14 | something that someone has wanted to say that I did not |
| 15 | necessarily raise, they can certainly address that issue in |
| 16 | that time. |
| 17 | I have not yet made a determination whether I will |
| 18 | rule from the bench today or reserve, but we'll see how things |
| 19 | go in terms of the answers to my questions, and then I'll make |
| 20 | a determination as the proceeding continues.  But I have read |
| 21 | through the materials. |
| 22 | So let me start with some of the more generally |
| 23 | applicable issues that were raised.  In the motions, the |
| 24 | Angelos firm argued that the subpoenas are improper under |
| 25 | Federal Rule of Civil Procedure 45 because it is not a party to |

1   a contested matter, and Bestwall did not obtain an order under

2   the relevant bankruptcy Rule 2004.  Obviously Bestwall made a

3   counterargument, and then Peter Angelos did not address the

4   counterargument in its reply.

5            Is there anything else that the Angelos firm wanted

6   to say on that issue?

7            MR. WALDREP:  Your Honor -- I am vaccinated and

8   boosted.

9            THE COURT:  Okay, good.

10           MR. WALDREP:  Your Honor, no.  We will not be arguing

11  that matter -- that issue today.  When the subpoenas were first

12  issued, they did not reference anything, and so now, of course,

13  they are in reference to the estimation proceeding which Your

14  Honor knows about, so we are not going to press that argument

15  today.

16           THE COURT:  Good, and I think that's the right call.

17  I was persuaded by Bestwall's argument regarding the estimation

18  proceeding, so that takes care of that general issue.

19           So the next general issue that was raised is the

20  Angelos firm's argument regarding the *Shelton* standard for

21  issuing testimonial subpoenas to opposing counsel.  The

22  question that I had with respect to that argument again is

23  directed to the Angelos firm which is whether there's any

24  authority for extending the *Shelton* holding to cases like this,

25  which there are sort of three categories, I think, that would

1    require an extension: Subpoenas seeking testimony of a lawyer

2    who's not opposing counsel in the particular litigation in

3    which the subpoenas had been issued.  The second is subpoenas

4    for documents as opposed to testimony, and then the third is

5    subpoenas seeking information relating to concluded cases.

6             I don't know if you want to address any or all of

7    those.

8             MR. WALDREP:  Yes, Your Honor, just writing down the

9    question to make sure that I've gotten it.

10            THE COURT:  Sure.

11            MR. WALDREP:  Your Honor, may I use the podium to

12   address --

13            THE COURT:  Absolutely if you're more comfortable

14   there.

15            MR. WALDREP:  Your Honor, the short answer to your

16   question is yes, there is precedent for extending -- I'm not

17   even sure that it's an extension, Your Honor, of the *Shelton*

18   doctrine.  The seminal case of course by the Eighth Circuit,

19   which other courts have used -- there *Shelton* said there are

20   three elements when you're seeking to depose opposing counsel.

21   I'm well aware of Your Honor's question about this situation,

22   and I will get to that.

23            THE COURT:  Sure.

24            MR. WALDREP:  If you would indulge me to sort of lead

25   up to that.  So the first is that there is no other possible

1   means of obtaining the information sought, the first of three

2   elements.  The second is that the information must be relevant

3   and nonprivileged.  The third is that the information must be

4   crucial to the deposing party's case.  So Bestwall does argue

5   that the *Shelton* test, the *Shelton* case should not apply in

6   these circumstances because the law firm has never been counsel

7   to a party to the estimation proceeding, the estimation

8   proceeding pending in front of the bankruptcy court.

9        And at this juncture or some other, Your Honor -- and

10  I will be directed by the Court -- I would like to give the

11  Court some context and background.  You've heard from both

12  sides there's an estimation proceeding going on before Judge

13  Beyer in the bankruptcy court in Charlotte, North Carolina.  I

14  would love to give some context to that if the Court would like

15  to hear it.  If not, I will move on directly to answer your

16  question.

17       THE COURT:  Sure, that's fine because I think we will

18  get into that issue at some point in time anyway because we do

19  need to talk about the resolved claims sample, so if you'd like

20  to give me that background now, that's fine as well.

21       MR. WALDREP:  It would actually, I think, assist my

22  argument if you don't mind, Your Honor.

23       THE COURT:  Sure.

24       MR. WALDREP:  So Bestwall filed bankruptcy in North

25  Carolina -- Charlotte, North Carolina; it was the Western

1  District of North Carolina, and that was in 2017.

2  Georgia-Pacific, a top Fortune 50 company that we've all heard

3  of, is the predecessor to Bestwall.  Georgia-Pacific had a

4  decades long history of asbestos litigation that derived from

5  its acquisition of a company called Bestwall Gypsum Company.

6  So Bestwall Gypsum Company manufactured and sold certain

7  asbestos-containing products, principally a joint compound used

8  in drywall.

9         Georgia-Pacific continued to manufacture and sell

10  those products following its acquisition of Bestwall Gypsum.

11  In July of 2017 Georgia-Pacific underwent a corporate

12  restructuring through what's called a Texas divisional merger.

13  I know that sounds like a contradiction in terms, divide and

14  merge.  So it's known pejoratively, I understand, as the Texas

15  two-step, but it's authorized by the Texas Business

16  Organization's code and what it is is it involves the formation

17  of two new companies.  You take the original company, form two

18  new companies, and you divide up the assets and the liabilities

19  of the two companies into those two new -- of the former one

20  company into the two new companies.  Okay.

21         And the original Georgia-Pacific ceased to exist, and

22  a new Georgia-Pacific was formed.  Bestwall -- that's the

23  debtor in North Carolina -- received certain assets, and it was

24  assigned certain liabilities of old Georgia-Pacific, including

25  all of its asbestos tort liability.

1          THE COURT:  Were those the only two entities that

2    resulted from the divisional merger?

3          MR. WALDREP:  That's right, Your Honor.  So you get

4    Bestwall that, again, was formed in July of 2017 just a few

5    months before it filed bankruptcy, and it got all the

6    liabilities for the torts, got some assets.  Then the other

7    company took everything else, the other considerable assets and

8    some trade liabilities, minor liabilities.

9          A few months later, on November 2, 2017, Bestwall

10   filed bankruptcy.  Now as part of this restructuring, Bestwall,

11   the debtor, debtor that is the subject of the bankruptcy in

12   North Carolina, became a party to a funding agreement with new

13   Georgia-Pacific.  Now I say new Georgia-Pacific because it was

14   formed as a part of this divisional merger under Texas business

15   code.  It's where all the vast majority of the assets are is

16   in -- I'll call it new Georgia-Pacific and new Georgia-Pacific

17   agreed to pay all the costs and expenses of Bestwall, the

18   debtor, in the bankruptcy.

19         So the funding agreement also requires new

20   Georgia-Pacific -- which is really just old Georgia-Pacific

21   minus the tort liabilities as I've explained.  It requires new

22   Georgia-Pacific to pay for the funding of an asbestos trust.

23   And that is specifically an asbestos trust created under

24   § 524(g) of the Bankruptcy Code.  § 524(g) applies to

25   liabilities caused by exposure to asbestos.  That's all it

1   applies to, Your Honor, nothing else.

2            When a 524(g) trust is created, it then takes on all

3   the liability for asbestos tort that the debtor has.  That

4   trust, such a trust, a 524(g) trust can only be created by

5   confirmation of a plan of reorganization in bankruptcy.  Again,

6   524(g) is part of Title 11, under the Bankruptcy Code.  To be

7   confirmed, this is right in the statute, the plan must be

8   accepted by 75 percent of the current asbestos claimants.  This

9   is going to tie into something that I would like -- it's one of

10  the exhibits I have because I wanted to show you what a ballot

11  looked like because that's what that ballot is for.

12           So the bankruptcy court in North Carolina has decided

13  to estimate Bestwall's asbestos liability.  That means the

14  bankruptcy court in North Carolina is going to estimate all the

15  liability of all the claims for asbestos liability that

16  Bestwall has.  That's the process you've heard about that is

17  currently scheduled for October of next year.

18           THE COURT:  October of next year?

19           MR. WALDREP:  2023, that's correct.  Coincidentally,

20  the case will be seven years old at that time.

21           So this -- an estimation is not done in every

22  asbestos case, but in this case Judge Beyer has determined that

23  she wants to do an estimation under § 502 of the Bankruptcy

24  Code.  § 502 allows any bankruptcy court to estimate a claim or

25  group of claims in order to determine how they might be treated

1   under a plan of reorganization.  A 524(g) type of plan of

2   reorganization is a very specialized type of bankruptcy.  This,

3   as I say, is set for October of next year.  Okay.

4           This is all by way of background.  I promise I'm

5   going to connect this up to the question you asked me, I

6   promise.  In July of 2020, and that's almost two years ago,

7   Bestwall issued a subpoena duces tecum to the Delaware claims

8   processing facility.  We call it DCPF; it's the Delaware Claims

9   Processing Facility.

10          This is the claims processing and management system

11  that is used by several 524(g) trusts that have been created in

12  Delaware through various bankruptcies.  That subpoena -- again,

13  issued in July 2020 -- sought personal data for 15,200 Bestwall

14  claimants who filed claims through trusts managed by DCPF.

15          The district court in Delaware, this is Judge

16  Connolly, quashed that subpoena.  The Court indicated that it

17  would allow a subpoena seeking a random sample of up to 10

18  percent of the 15,200 claimants.  Bestwall appealed that order

19  and a subsequent clarifying order and oral argument was heard

20  on those appeals before the Third Circuit two weeks ago, on

21  March 15, I believe.  Okay.  One more thing --

22          THE COURT:  I'm guessing the way circuit courts go,

23  it will be a while before we necessarily have a response?

24          MR. WALDREP:  Yes, ma'am.  You know how that works, I

25  know how that works.  We just don't know.

1          THE COURT:  Right.

2          MR. WALDREP:  One more thing I wanted to add before I

3   directly answer the Court's question, but I think this helps

4   explain some of the things I'm about to say.  On October 28 of

5   2021, that's just October of last year, Bestwall moved the

6   bankruptcy court, Judge Beyer, in Western District of North

7   Carolina for an order -- here I'm quoting -- "approving a

8   sample of resolved Bestwall mesothelioma claims" which it

9   called a "resolved claim sample."

10          As proposed by Bestwall, this resolved claim sample

11   would consist of 1,501 claims that would not be randomized.

12   Meaning they were selected and not just selected randomly.

13   Bestwall argued that the use of this resolved claim sample

14   would reduce time, and it requested that the bankruptcy court,

15   quote, determined that the resolved claim sample was

16   appropriate for use in the estimation proceeding.

17          Your Honor, as I think I can address later if I have

18   the opportunity, resolved claim sample does not include some of

19   the claims that Bestwall now seeks through these subpoenas.

20   Your Honor, more background -- I know this is in our briefing,

21   but there were three subpoenas served on three different law

22   firms.  This is the first to be heard.  Another one is in

23   Dallas on an April 11 hearing, and another one is in Miami on

24   April 12.

25          Anyway, the bankruptcy court denied the resolved

1  claim sample motion.  It was denied.  And Bestwall still, still

2  has not reissued subpoenas to the DCPF consistent with the

3  Delaware court's June order.  In other words, Judge Connolly

4  said, "I'm going to quash this subpoena but if you do it

5  differently, if you only look at ten percent and it be

6  randomized and anonymized, I will grant your subpoena."

7  They've never tried to do that again.  Instead they appealed,

8  as you know.

9          THE COURT:  Let me clarify something because you lost

10  me a little bit at the end there.  When you say the North

11  Carolina court denied the resolved claim sample motion --

12          MR. WALDREP:  She did.

13          THE COURT:  She is not then restricting her look to

14  1,501?

15          MR. WALDREP:  No, she declined and said:  Go talk to

16  Delaware, Judge Connolly told you how to do this.

17          THE COURT:  Okay.  She declined to use the specially

18  selected 1,501 claims --

19          MR. WALDREP:  Correct.

20          THE COURT:  -- so we don't yet know whether she's

21  going to be looking at the entire pool, whether she's going to

22  be looking at a randomized sample --

23          MR. WALDREP:  Correct.

24          THE COURT:  We don't know what that bankruptcy

25  proceeding is going to look like.

1        MR. WALDREP:  Right.  All these hearings, including

2    this one in front of Your Honor, are all about evidence that

3    one party or another claims is relevant to the estimation

4    proceeding.  Here we're talking about obviously big dollars, so

5    the parties have this rolling road show, and here we are today

6    in front of --

7        THE COURT:  Which explains the number of lawyers that

8    are here today, yes, okay.

9        MR. WALDREP:  You asked me what about *Shelton* and how

10   does it apply to this situation, and I appreciate Your Honor

11   letting me sort of give some background into this.

12       Okay.  The law firm who is the subject of this

13   subpoena, the Peter Angelos firm, is asbestos counsel to

14   numerous current and potential asbestos claimants that are

15   creditors of Bestwall and, therefore, are parties in interest.

16   That's a bankruptcy term, Your Honor.  You know, in normal

17   litigation, you have a plaintiff or defendant or multiple

18   plaintiffs and defendants, you have people in front of the V

19   and behind the V.  In bankruptcy it's different.  The only

20   party that's on the caption is the debtor's name, and then you

21   have parties in interest.  It's a weird system but that's our

22   system.

23       THE COURT:  But you'll concede, though, that nothing

24   that's being requested in these subpoenas relates to the

25   Angelos firm's representation of any current parties in

1    interest?

2            MR. WALDREP:  That's right, absolutely right.  The

3    information that Bestwall seeks regarding these cases involves

4    legal decisions and work product that are relevant to the

5    pending claims of other claimants represented by the law firm.

6    As well as the estimation of those claims.  So, Your Honor, as

7    you might guess, if you're a plaintiff's law firm, you

8    represent mesothelioma victims, there is a certain procedure

9    where you do things, there are things you decide to investigate

10   or not investigate.

11           In fact, these cases -- kind of interesting -- they

12   sort of never stop because what happens is the client comes in,

13   he has mesothelioma.  It's a death sentence, no one's ever

14   survived it.  Then the question is: Who caused that, how did

15   you get exposed?  Immediately they interview the client and

16   they investigate and say, okay, did you work at this place, or

17   did you get exposed to this product, and they are working the

18   case.  That actually continues over a series of years because

19   as new science and evidence comes out with regard to a

20   particular product, that opens up another possibility of

21   exposure.  Okay.

22           So looking at these files would give Bestwall insight

23   as to the investigative and analytical process that the Peter

24   Angelos law firm uses to prosecute these cases.  Think about --

25   here's one more sort of side point for Your Honor, but I think

1   this is important.  If a plan is not confirmed in Bestwall --

2   you remember I said that 75 percent of the claimants have to

3   approve the size of the trust.  It's a negotiated thing

4   obviously, and there's been a couple of negotiations already in

5   Bestwall and they failed, and so we're now into an estimation

6   proceeding.

7         But if 75 percent of the claimants do not vote in

8   favor of that, the plan fails.  The case fails.  The case is

9   dismissed and these claims are returned to the court system, to

10  the tort system from whence they came.  Giving Bestwall these

11  files would give them a significant advantage.

12        Okay, precedent.  *Monster Energy v. Vital Pharm*.

13  This is cited in our briefing.  It's 2020 Westlaw 2405295.

14  It's in the Central District of California, and it's from March

15  of 2020.  Here I'm quoting from the Court:  "Discovery sought

16  from opposing counsel is universally disfavored."  Under very

17  similar facts as to what is before this Court right now, the

18  Court applied the *Shelton* test and quashed the subpoenas.  Here

19  I'm going to quote from the Court:  "Although subpoenaed

20  attorneys no longer represent *Monster*, they previously

21  represented *Monster* and established a privileged attorney-

22  client relationship.  Accordingly, for purposes of the

23  discovery analysis, the Court does not distinguish subpoenaed

24  attorneys from current counsel."

25        I think that's directly on point.  I have another one

1    I'm going to get to, Your Honor.  Of course in that case, the

2    district court in California quashed the subpoena.

3         Bestwall seeks, Your Honor, the files of this law

4    firm so that it can learn from those files, learn the

5    practices, strategies and analysis of the law firm.  So, Your

6    Honor, I have -- I'm going to skip over my further explanation

7    of the three -- the application of the three *Shelton* factors to

8    this case.  Happy to go back to it.  I think it's the central

9    part of my case.

10        But to continue to answer the Court's question.  Your

11   Honor, though the selective plaintiffs' cases are closed,

12   closed, this doesn't preclude the application of *Shelton*.  Here

13   we cite *Desert Orchid Partners v. Transaction Systems*

14   *Architects* cited in our brief.  In *Desert Orchid* the Court

15   applied the *Shelton* test to subpoenas of former general counsel

16   who was previously involved in formulating litigation

17   strategies.  Former general counsel.  Here Bestwall seeks

18   information arising from the law firm's involvement in these

19   six, seven cases that they are seeking to talk about or they

20   want to discover from this law firm.  As I said, it

21   indisputedly involves legal decisions and work product created

22   by this law firm.

23        Yes, the Angelos firm is not a party to the

24   bankruptcy case in the sense that it's not in the caption, I

25   agree.  No creditor is ever in the caption of a bankruptcy.

1    But the Angelos firm represents claimants against Bestwall who

2    are indisputedly parties in interest to the estimation

3    proceeding.  They are creditors of Bestwall.  These claimants

4    are creditors of Bestwall, current creditors of Bestwall and

5    their claims, along with all the other asbestos claims, are

6    being estimated.  That's what the procedure is about.

7            So accordingly, just as the Court did in *Desert*

8    *Orchid*, we believe the *Shelton* test does apply to these

9    circumstances.  Your Honor, I will shut up unless you have

10   further questions of me.

11           THE COURT:  No, I think that's fine.  That answers my

12   question for now.  Mr. Curlett, would you like an opportunity

13   to respond?  And I'll give you some leeway also if you would

14   like to counter or agree with or otherwise address the general

15   background of the estimation proceeding.

16           MR. CURLETT:  I'm inclined -- my first instinct, Your

17   Honor, is to answer your question, but I would be more than

18   happy to frame the issues as I see them more broadly.  Perhaps

19   I'll start with *Shelton*.

20           THE COURT:  Okay.

21           MR. CURLETT:  Then if I ever need to step back and

22   tell you why we're trying to do what we're doing, I can do

23   that.

24           Your Honor, so Angelos has raised the *Shelton* issue.

25   Now even assuming that the *Shelton* rule applies in the Fourth

1   Circuit, which it does not, that rule does not apply here.

2   That's because here the subpoenas seek discovery about the

3   selective plaintiffs' cases which have concluded, as Your Honor

4   rightly points out.  Angelos is not counsel in the estimation

5   proceeding to the bankruptcy court.  Either of these reasons

6   independently means that *Shelton* does not apply on its face.

7   That's set out in detail in our opposition.

8           *Shelton* also only applies to depositions and does not

9   even by its terms apply to document requests.  *Shelton* is only

10  applicable where the attorney being deposed is trial or

11  litigation counsel, and the subject matter of the deposition

12  concerns litigation strategy.  That is what was addressed in

13  *Desert Orchid*, the case just cited by Angelos, but which is

14  distinguishable for that reason from what we're seeking here.

15          Angelos relies on the fact that it is counsel for

16  creditors in the bankruptcy case which we've just heard them

17  repeat, but those creditors are different from the selected

18  plaintiffs and, again, another reason that *Shelton* does not

19  apply.  And the involvement of pending claimants in the

20  bankruptcy case has been limited to answering simple discovery

21  in connection with the estimation proceeding.  Far cry from the

22  circumstances of the lawyer whose deposition was sought in

23  *Desert Orchid*.

24          The opposing counsel in this case for purposes of the

25  estimation proceeding represent two parties, the Asbestos

1    Claims Committee, the ACC, and the Future Claimants Committee,

2    the FCR, not the claimants.  There's a secondary case, *Pamida*,

3    which arose in the briefs.  Your Honor hasn't specifically

4    asked the question but it's related to the *Shelton* argument, so

5    I'll point out simply this:  That in its brief, Angelos takes

6    out of context a line from *Pamida* to suggest that even if

7    *Shelton* does not apply, we must show that the attorney-client

8    product and work product protections have been waived.

9            I want to be sure I communicate that that is plainly

10   incorrect.  Those standards had to be satisfied in *Pamida*

11   because unlike here, the party was seeking information that was

12   work product and privileged.  Information -- in that case

13   information regarding attorney's fees occurred in the prior

14   action for which plaintiff was seeking indemnification.

15           The cases that we cite apply in *Pamida,* and the

16   Fourth Circuit recognized this.  The information requested or

17   that the Court permitted did not implicate work product and

18   attorney-client privilege, and so those standards did not have

19   to be met even though it was obtained from counsel.  Angelos'

20   assertion that the documents that we seek are protected by

21   attorney-client privilege and the work product doctrine are

22   flat wrong.  We see trust claim forms, ballots and Rule 2019

23   statements.

24           THE COURT:  I'll definitely be getting into more

25   specifics in terms of your requests and what might or might not

1    be included as we go on.

2            MR. CURLETT:  That's my answer to *Shelton*.  I'll be

3    happy to sit down now if Your Honor wants to continue with the

4    Court's concerns.

5            THE COURT:  Why don't -- I just want to give you an

6    opportunity, since I did get some background as to sort of

7    what's going on in North Carolina from Mr. Waldrep.  If there's

8    anything you want to say at this point to address any of that,

9    I'm happy to hear it so that I'm not operating under one side's

10   view of the larger landscape.

11           MR. CURLETT:  I appreciate that.  In that case, I

12   will turn to a proceeding that was conducted in the bankruptcy

13   in North Carolina, and I'm going to read for Your Honor an

14   excerpt from the transcript of a proceeding that took place on

15   March 4, 2021.  Prior to the decision that the estimation

16   proceeding would take place, which constitutes a contested

17   matter and therefore precludes, generally speaking, a Rule 2004

18   examination and then steers the parties to Rule 45 which is

19   narrower.  The idea there being that once there's a contested

20   proceeding, you follow the Federal Rules of Civil Procedure.

21           But when there's not a contested proceeding, then

22   Rule 2004 examination applies, and the Court can make discovery

23   determinations in that way.

24           So at the stage of the litigation that I'm going to

25   decide for Your Honor, the Court was entertaining a motion for

```
 1   Rule 2004 examination of bankruptcy trusts, and these were
 2   bankruptcy trusts similar -- requests similar to the discovery
 3   that we are seeking here under Rule 45 but the thrust is the
 4   same.  Because the nature of the information that is being
 5   sought for the estimation proceeding, which was at issue before
 6   the court in North Carolina, is the same type of information
 7   that we're seeking here.  I think this will provide Your Honor
 8   particular insight into the way this is being viewed by the
 9   bankruptcy judge in North Carolina that has to make this
10   decision about how we're going to estimate these claims.
11           Here's what the judge said:  "With respect to the
12   motion for Rule 204 examination of bankruptcy trusts, I
13   conclude I should grant the debtor's motion for the 2004 exam
14   of bankruptcy trusts pursuant to Rule 2004 and that the debtors
15   have met their burden of showing that the information sought is
16   both relevant and necessary to the case.  The information is
17   relevant to the determination of whether prepetition
18   settlements of mesothelioma claims provide a reliable basis for
19   estimating the debtor's asbestos liability which has been put
20   at issue by the ACC and the FCR.
21           "It's relevant to Dr. Bates" -- the expert in that
22   case -- "Dr. Bates's estimation of the debtor's liability, and
23   it will assist the debtor in developing its trust distribution
24   procedures and evaluating those procedures proposed by the ACC
25   and the FCR in their plan.  And I'm sufficiently convinced
```

1   based on the evidence introduced by the debtor regarding the

2   eight cases in which it alleges there was a failure to disclose

3   material exposure evidence, that there's a good faith basis for

4   the trust discovery it seeks."

5           I read that, Your Honor, to mean that the Court is

6   eager to have this discovery take place and to be able to allow

7   the parties and the debtors to advance the arguments on the

8   appropriate procedure in the estimation proceeding.

9           THE COURT:  Just to back up a little, but then it did

10  not happen because we switched into this other type of

11  bankruptcy proceeding -- you're saying this more preliminary

12  stage?

13          MR. CURLETT:  A more preliminary stage addressed to

14  other entities.  But then once the estimation proceeding was

15  under way, we pivot to Rule 45 and issue our subpoenas there.

16  Appropriately so, which is -- although their lead argument in

17  their opposition has now been abandoned.

18          THE COURT:  Right, okay.

19          MR. CURLETT:  We also rely heavily also on *Garlock*,

20  not as a matter of legal precedent but because the *Garlock* case

21  was the first opportunity that the federal courts have taken to

22  recognize and explicitly state that there have been significant

23  discovery abuses throughout the history of asbestos litigation;

24  that in the *Garlock* case, as Your Honor I'm sure is aware,

25  having read the briefs, led the Court to reject the $1.3

1    billion proposed estimation by the ACC and the FCR and instead

2    adopt the debtor's $125 million estimation based upon the

3    viability and the damages in the remaining claims, as opposed

4    to extrapolating the history of settlements which were inflated

5    because the plaintiffs' firms didn't disclose the evidence they

6    were required to disclose in discovery.

7           The judge in North Carolina in that hearing states,

8    "Judge Hodges," the judge presiding in *Garlock*, "was dead on in

9    *Garlock* when he said that the settlement approach and the legal

10   liability approach to estimation are not matters of law but

11   rather matters of evidence.  The Court will hear such evidence

12   as is appropriate relating to each approach and will make its

13   decision upon which is more persuasive.  He also noted that no

14   court has held that the analysis of the debtor's claims

15   resolution history is the exclusive means to estimate

16   liability.  In fact, courts in prior cases have analyzed the

17   merits of claims at estimation."

18          So right now we are in a very discrete sliver of the

19   enormous litigation that has taken place in the Western

20   District of North Carolina Bankruptcy Court, in the District

21   Court in Delaware.  I'm happy to address the sample motion at

22   Your Honor's preference.  But all of this is going to go back

23   to ensure that the bankruptcy judge in North Carolina has the

24   information that she needs to be able to look at the evidence

25   for both sides, for the arguments that they're making about how

1    the estimation proceeding should be conducted.

2            Our subpoena seeks three categories of trust

3    documents, none of which are privileged, none of which are

4    protected work product, none of which involve litigation

5    strategy of the Angelos firm, and other tort related

6    information.  All because the Court in Delaware has said this

7    is the appropriate evidence to take and discovery to be carried

8    forth so that they can make the decision.

9            Granting the motion to quash will deprive the

10   bankruptcy court in North Carolina of the information we think

11   it needs to be able to conduct the same evaluation that that

12   court did in the *Garlock* case.

13           THE COURT:  Let me ask you, Mr. Curlett, for a moment

14   about the resolved claim sample issue because that was sort of

15   next on my list anyway, and then I can give Mr. Waldrep a

16   chance to respond.  But it sounds to me like the proposed

17   resolved claims sample in North Carolina may no longer be a

18   viable measure of anything?  If the judge has said we're not

19   going to abide by this, then does it matter which cases were on

20   the list of 1,501 and which weren't?

21           MR. CURLETT:  No, it's a huge red herring in this

22   courtroom today.  It has no bearing or influence.  It's in no

23   way informative on what's happening here, the subpoena that

24   we've issued, the legality of the subpoena, appropriateness of

25   the information; it's completely unrelated.

1          THE COURT:  And it's even unrelated at this point to

2    what's happening in North Carolina, correct, because the judge

3    has rejected that list of 1,501.

4          MR. CURLETT:  As counsel correctly points out, the

5    judge in North Carolina doesn't want to step on the toes of the

6    district court judge in Delaware, so they're managing how

7    they're going to respond to that subpoena.

8          The subpoenas are different; they call for different

9    types of information.  In the DCPF proceeding you're looking

10   for data, claims form data that's going to come out of Excel

11   spreadsheets.  Here we're saying give us the documents that are

12   coming out of your client files that aren't privileged and the

13   claimants that they relate to because then we're going to know

14   what was happening when the settlements were reached or when

15   the trial was conducted or when the depositions were taken in

16   the underlying tort cases.  Did we have all the information we

17   were supposed to have?

18         Back in Delaware -- so Bestwall issues a subpoena

19   authorized by the Court to get -- for 15,000 claims.  The Court

20   says -- I think really for reasons that concerned compromising

21   personal information relating to those sought said, look, this

22   is too broad, this creates too much risk so why don't we do a

23   sample.  Then the sample was proposed to be a statistical

24   sample.  So we're going to randomly select 1,500 cases, that

25   way there's some statistical significance.  It also means that

1    there's no "there" there as to whether or not any of the

2    claimants for which we're seeking discovery in this matter

3    happen to be caught in the net of the statistical sampling that

4    led to the 1,500 cases there.

5         So once the district court in Delaware said, all

6    right, let's go with 1,500 because that's not burdensome --

7    tangentially, Your Honor, if 1,500 isn't burdensome, neither is

8    seven which is the number of records we're seeking.  So then

9    the parties go back to Delaware, take it up in front of that

10   judge, and the judge says, "I'm not getting involved, it's

11   properly before Delaware; handle it as you wish."

12        THE COURT:  That's what North Carolina said:  "I'm

13   not getting involved"?

14        MR. CURLETT:  Correct.  If I misspoke, I apologize.

15   That's what North Carolina said.  Delaware, now that issue is

16   before the Third Circuit, it will do what it does.  But

17   regardless of how that all plays out, at the end of the day,

18   the bankruptcy court in North Carolina is still going to have

19   to conduct this estimation proceeding, and it is still going to

20   be critical, vital if we're applying the *Shelton* test, for that

21   court to have the information that we are seeking as far as how

22   these tort claims were settled and what information was

23   provided in discovery before it.

24        THE COURT:  I guess what I'm trying to be sure, so

25   the argument in the briefing, as I understood it, was that

 1   there was a list of 1,501 specially selected claims in North

 2   Carolina originally and then six of the plaintiffs here.  I'm

 3   not sure if it's six of the seven or six of the overall group

 4   from the three attorney subpoenas that are pending in different

 5   jurisdictions were not on that list of 1,501.  I guess what I'm

 6   trying to understand is that although there may be a separate

 7   list randomly selected of roughly 1,500 claims in Delaware that

 8   might come into play at some point, at this point there is no

 9   list of 1,501 in North Carolina that has any meaning?

10            MR. CURLETT:  That's absolutely correct.

11            THE COURT:  Okay.  That's what I wanted to make sure

12   I understood.  Thank you.

13            MR. CURLETT:  Thank you.

14            THE COURT:  Mr. Waldrep, do you wish to respond as to

15   this sampling issue?

16            MR. WALDREP:  Thank you, Your Honor.  Yes, I do.  As

17   to the need for this fraud information -- and you were read a

18   quote from Judge Beyer -- Judge Connolly disagreed.  He quashed

19   it.  Opposing counsel talked about *Garlock*.  And *Garlock* was

20   the first to adopt this approach that somehow rampant fraud is

21   part of all these plaintiffs' firms that bring these asbestos

22   claims.  There's probably been almost 70 524(g) bankruptcies in

23   our nation's history.  524(g) was created by Congress after the

24   *Johns Manville* case so it was modeled on the *Johns Manville*

25   approach.  But fraud assertions have not been countenanced in

1  the other cases.

2          Your Honor, Judge Beyer was Judge Hodge's permanent

3  law clerk for over ten years.  I don't know exactly how many

4  years.  She was Judge Hodge's law clerk when he was presiding

5  over *Garlock*.  *Garlock* was 2010, it was filed in 2010.  So

6  yeah, those cases, Judge Hodges and Judge Beyer have seen fraud

7  as a part of this process, the estimation process, but go back

8  and try to find where anybody else has.  They are outliers,

9  Judge.

10          THE COURT:  Has the issue been raised in other cases

11  and they found no fraud?  Or has it --

12          MR. WALDREP:  I'm not aware of that, Judge.  They've

13  been going on for decades so I am not aware whether they were

14  even raised, so I cannot answer that question, Your Honor.  I'd

15  be happy to find out if I can, but I can't answer it.

16          The random claim sample is not a red herring, is not

17  a red herring.  That is inconsistent with what they say is

18  crucial.  I know they've called it a random claim sample.  I

19  don't know that it was random at all, but I know this -- maybe

20  it was, maybe it wasn't.  But I know that of the 23 plaintiffs'

21  cases they are seeking among the three law firms -- this being

22  just one of them -- six of them are not on that random claim

23  sample.

24          THE COURT:  How many of our seven are not on --

25          MR. WALDREP:  Two.  Mr. Warfield and -- I have the

1    other one written down.  Two of the seven are not.

2           The last thing I'll say is we have over a year and a

3    half for the Third Circuit to tell us what they think about

4    this, and I think it's -- at least one avenue this Court could

5    take is to see what happens with the Third Circuit.  I realize

6    we don't know when they'll rule though.

7           THE COURT:  Do you agree, though, with Mr. Curlett's

8    characterization that the issue in terms of what will actually

9    be produced in Delaware differs from what's being subpoenaed

10   here?  He described it as more of a data set on a spreadsheet.

11   Whatever 1,500 cases are selected or if that's even the

12   methodology that's employed, the data set will be different

13   than the type of documentation that's being sought with these

14   subpoenas.

15          MR. WALDREP:  The reason why they moved for 1,501 is

16   that Judge Connolly said, "I will let you do this.  I will let

17   you take ten percent -- and that's ten percent of the original

18   15,200 -- and I will let you anonymize it and I will let you

19   randomize it, so you can't tell who the individual claimants

20   are."

21          These are people that don't want their personal

22   information out there, as we all can appreciate.  So I think

23   it's notable, Judge, that he invited them to come back to him

24   with that type of subpoena; they have not done it.

25          THE COURT:  But the information that was being

1   subpoenaed by the -- I want to make sure I get the acronym

2   correct at this point, the entity in Delaware --

3             MR. WALDREP:  DCPF.

4             THE COURT:  Yes, DCPF.  The information being

5   subpoenaed by them is not the same documentation that's being

6   subpoenaed from the Angelos firm; is that right?

7             MR. WALDREP:  It is the same type of information,

8   Your Honor.  There's a tremendous overlap there.  I won't say

9   it's exactly.  It's not exactly.  But yes, they want to know

10  trust claims.  Claims that a particular claimant has made

11  against particular trusts.  Right?  Because when a trust is

12  created by one of these bankruptcies, then the claimant -- this

13  is one of the exhibits that I would like to explain to the

14  Court.  The claimant files --

15            THE COURT:  I'm happy to look at your exhibits.  I

16  have them here.

17            MR. WALDREP:  I would love to go through them if I

18  might, Your Honor.

19            THE COURT:  Sure.

20            MR. WALDREP:  Because this does anticipate what I

21  think I heard you saying a moment ago, talking about what

22  specifically do you want from these folks.  The first one in my

23  packet is a proof of claim form.  That is an official federal

24  form for -- this is what -- when a creditor in bankruptcy files

25  a proof of claim, this is the form they use.  And it says you

1   owe me so much and it gives the reasons why you owe me that

2   amount, and it's signed under penalty of perjury and all that.

3          I believe the argument that we're hearing from

4   Bestwall is, well, all these other things are just like this.

5   They're not.  The reason that I show you this is to go

6   through -- one moment, Your Honor -- is to go through what

7   these really are.  Because they say these are relevant to the

8   estimation proceeding.  I would urge the Court to always keep

9   in mind we're talking about relevance to the estimation

10  proceeding.  Okay.  All right.

11         So the first one is the proof of claim.  Bankruptcy

12  Code defines a proof of claim as a right to payment whether

13  contingent, a liquidated fix, all that.  But it's a right to

14  payment.  And you see that, you see that example -- it's not an

15  example.  It is the official form.

16         Then you have a trust claim.

17         THE COURT:  This is Exhibit 2 now?

18         MR. WALDREP:  Exhibit No. 2, Your Honor.  A trust

19  claim form.  This was what I was getting into earlier, and it

20  prompted me to want to go through these --

21         THE COURT:  These get filed with the DCPF?

22         MR. WALDREP:  Correct, that's right.  So what they

23  want to know is what claims has -- what trust claims has a

24  particular claimant made against one of the trusts?  And this

25  is the form that they use.

1    THE COURT:  Now let me ask a question about the DCPF.

2   Does it only manage certain trusts in Delaware, or do other

3   states have CPFs of their own, or is Delaware like a

4   centralized repository of trust claim forms?

5    MR. WALDREP:  Most of them are DCPF but not all of

6   them.

7    THE COURT:  So there are other CPFs in other places?

8    MR. WALDREP:  Versions of it, Your Honor.  The

9   majority of all the big ones are in -- I don't know how

10  Delaware got to be so important in our legal field, but you

11  understand that.

12   THE COURT:  Sure.

13   So if someone were to get information from the DCPF

14  about the number of claims that a particular claimant has made,

15  they're going to have a fairly -- possibly not entirely but

16  fairly comprehensive view of the number of claims?

17   MR. WALDREP:  Yes, they are.  And what they're trying

18  to see, I guess, is, well, what about -- we need to share our

19  liability with somebody else, and we want to see what claims

20  you've made against somebody else.

21   Look at the -- the trust claim process was designed

22  to require only evidence relevant to whether the asbestos

23  company would have had any liability to this given plaintiff,

24  and an asbestos trust maintains site lists on a website, and

25  it's a site, a known site for exposure to asbestos.  So you can

1  look on there, the law firm can look on there, the claimant can

2  look on there and say, "Well, I used to work at that place.

3  Maybe one of the exposures I have, because I have mesothelioma,

4  was that place." Or products, it can be products.  Asbestos is

5  in hair dryers, Your Honor.

6            THE COURT:  Sure.

7            MR. WALDREP:  It's a lot of different products that

8  we don't realize.  It's in Johnson & Johnson's baby powder.

9  I -- one of the counsel that represent the committee in the LTL

10 case which is the result of a Texas two-step that Johnson &

11 Johnson just did, and it's pending in New Jersey.

12           Asbestos trust contains site lists, where asbestos

13 was known to be present, and a claimant only needs to provide

14 limited information including data such as occupation, the time

15 period they worked there, of course the site location, to

16 determine an entitlement to file this claim.  That's what this

17 form is.  It doesn't prove exposure.  There is no proof of

18 exposure on this, and therefore -- that's my relevance

19 argument, Your Honor.  Once the claim is filed -- and I think

20 this is very important -- it's the trust that decides whether

21 to pay the claim.  It's not the company because the company has

22 already set up this trust for the purpose of compensating

23 victims of asbestos liability.

24           So it's the trust itself that determines whether

25 there's a claim.  It's not the company and it's not the

 1   claimant; the trust does that.  They have a whole system, they

 2   each do.

 3           THE COURT:  But by getting the trust records, you'd

 4   be able to see how many times the claimant has at least

 5   submitted to receive money from a particular trust even if you

 6   cannot tell anything about the merits of their particular

 7   claim.

 8           MR. WALDREP:  That is precisely it, Your Honor.  You

 9   can see if they tried, but you can't see any merits to it.

10   It's not an evidentiary type of document is what I'm saying.

11           THE COURT:  Sure.

12           MR. WALDREP:  So the next document, the next exhibit,

13   Your Honor, which I believe is Exhibit 3 --

14           THE COURT:  Yes.

15           MR. WALDREP:  -- is a ballot.

16           THE COURT:  This is a ballot that the claimants

17   receive to decide whether they approve or not?

18           MR. WALDREP:  Yeah, it's called a master ballot but

19   it's just a ballot.  It's simply a ballot that a claimant files

20   to say yes, I am in favor of this plan that creates this 524(g)

21   trust, or no, I'm not in favor of it.

22           THE COURT:  While you say that clients fill it out,

23   it looks from its format like the attorney fills it out and

24   attaches a list of all the clients that that particular

25   attorney has?

1      MR. WALDREP:  Right again, Your Honor.  That's what
2  happens.  Because the attorneys have to help them -- these are
3  lay people -- to do that.
4      THE COURT:  So presumably most of the time -- I'll
5  use the Angelos firm as an example -- if they have 100
6  claimants, they would vote one way for all 100, or sometimes 80
7  of them would say yes and 20 would say no?
8      MR. WALDREP:  It happens both ways.  It does happen
9  both ways because there is obviously an attorney-client
10 relationship between each one.  It is the client's decision.
11 Most of the time the client is going to go with their firm's --
12 their attorney's recommendation.  I think most of us are used
13 to that, but every now and then somebody says, "No, I feel a
14 different way."
15     To submit a ballot, this ballot, the claimant need
16 only have a good faith basis for believing that he or she may
17 have a claim against a certain asbestos trust.  It does not
18 require a claimant to submit any evidentiary proof.  It does
19 not estimate or substantiate a claimant's right to payment.  It
20 does not determine liability of payment.  Simply a vote, that's
21 all.
22     THE COURT:  Do they have to have filed the trust with
23 the DCPF or like agency?
24     MR. WALDREP:  The previous one, yes --
25     THE COURT:  They have to have filed that --

```
1              MR. WALDREP:  That's correct.

2              THE COURT:  But no determination has yet been made as

3    to whether or not they're entitled --

4              MR. WALDREP:  Then it's up to the trust to decide

5    yes, do we accept this and, if so, how much are we going to

6    pay.  That's up to them.

7              Then further evidence may be needed but we're just

8    talking about the form.

9              THE COURT:  Sure.

10             MR. WALDREP:  This is part of what Bestwall is

11   seeking.  Again, my overarching point is these aren't relevant

12   to an estimation proceeding.

13             The last one or the fourth one, I wanted to give you

14   an example -- and that's what I've done here -- of a Rule 2019

15   statement.  Let's talk about that.  This is a statement of

16   which parties a particular law firm represents.  This is

17   obviously pursuant to Rule 2019 of the Bankruptcy Code.  And

18   that says:  Every group or committee that consists of or

19   represents multiple creditors -- a lot of law firms do

20   represent multiple claimants -- that are acting in concert to

21   advance their common interest have to file a verified

22   statement.

23             Here I've given you an example.  It is from Garlock,

24   just to give you an example of what it is that we're talking

25   about.
```

1      THE COURT:  Sure.

2      MR. WALDREP:  Now in *Garlock* -- this is not unusual.

3  In *Garlock*, Judge Hodges restricted access to 2019 statements.

4      THE COURT:  When you say "restricted access,"

5  restricted public access?

6      MR. WALDREP:  Correct.  And, you know, I know Your

7  Honor will understand this.  These -- plaintiffs law firms are

8  competitive, and they don't really want to show other firms any

9  more than they want to show Bestwall of how they do their

10  business and how they conduct themselves and how they settle

11  cases or anything like that, and I respect that.  So Judge

12  Hodges restricted access.  If anybody, and I mean anybody,

13  wants to see them, you simply have to apply to the Court.

14      So when they serve discovery on us, we don't have any

15  more right to give it to them than they do.  Somebody just

16  needs to apply to the court and say, "Can I have access to

17  this?"  And of course this might be in many different

18  jurisdictions.  I'm just saying it's a process.  Not every

19  bankruptcy court has done this --

20      THE COURT:  Not every court has restricted access.

21      MR. WALDREP:  Correct.

22      THE COURT:  *Garlock* did, some other judges do, some

23  judges don't.

24      MR. WALDREP:  *Garlock* did.  Exactly, exactly.

25      THE COURT:  Presumably in the Angelos firm's file for

1  a particular client, you would have the Rule 2019 statements

2  that were filed mentioning that client?

3           MR. WALDREP:  They would have it.  But to give it

4  over to Bestwall, they would have to apply -- if it is one of

5  those that's restricted, they would have to apply to the

6  particular court for authority to --

7           THE COURT:  But is it sealed or just restricted?  For

8  example, we in our clerk's office have certain documentation

9  that you can't go online, sitting at your desk, and look up; it

10 won't come up.

11          MR. WALDREP:  Yes.

12          THE COURT:  But if you go downstairs to the clerk's

13 office, you can sit there, they'll hand you the file and you

14 can look at it.  Is it that type of restriction?  Because that

15 type of restriction I don't think requires, at least here,

16 judicial permission to give to somebody; whereas if a document

17 was under seal, then it might require more authority.

18          MR. WALDREP:  Judge Hodges set up a judicial

19 procedure.  I don't know how to answer whether it's -- I know

20 what sealed means, but I don't know how to characterize it

21 other than saying you had to apply to the Court if you wanted

22 to see it.

23          THE COURT:  There.

24          MR. WALDREP:  Yes.

25          THE COURT:  What I'm trying to draw is a distinction

```
 1    between --
 2              MR. WALDREP:  Yes.
 3              THE COURT:  -- so there might be a distinction
 4    between a lawyer handing it over in a later proceeding or
 5    giving it to someone in a later proceeding versus someone being
 6    able to see it from the court file, right?  The document
 7    exists --
 8              MR. WALDREP:  Yes.
 9              THE COURT:  -- in the attorney's file and the
10    document exists in the court file.  I guess what I'm trying to
11    understand is whether Judge Hodges set up any restriction about
12    the attorney giving someone a copy of it from the attorney
13    file, not whether someone can go to court and get it from the
14    court.
15              MR. WALDREP:  That's the way we read it, Your Honor,
16    but -- if Judge Hodges or anybody tells us we're wrong about
17    that, then fine.  But the way we're reading that, that's a step
18    we'd have to take.  Certainly you don't want to be wrong about
19    stuff like this.  You kind of --
20              THE COURT:  Sure.  Definitely don't want to be asking
21    anybody to disregard what Judge Hodges wants.
22              MR. WALDREP:  Because there can be consequences.
23              THE COURT:  Sure.
24              MR. WALDREP:  The only other exhibits I had, Your
25    Honor, are not to talk about forms but the two affidavits that
```

1    were already filed with the Court.

2         THE COURT:  Okay.  All right, good.  Mr. Curlett, do

3    you want to talk about forms?

4         MR. CURLETT:  I would, Your Honor.  I'd like to talk

5    a lot about what was just said.  If I may take the podium for

6    this.

7         THE COURT:  Sure.

8         MR. CURLETT:  Select responses before I turn to the

9    forms.  Number one, Angelos has emphasized that the Court in

10   Delaware quashed the subpoena.  To state it in the way that

11   it's being stated both in writing and in open court today is

12   inherently misleading.  The subpoena wasn't quashed in the

13   sense that the Court found that it wasn't relevant or

14   appropriate.  The Court quashed it in the sense that it wanted

15   to limit the number of claims to mitigate risk of exposure.

16   Which was -- to say that the court in Delaware disagreed with

17   the court in North Carolina is grossly misleading.  The

18   critical agreement between those two courts is that everybody

19   recognizes this is relevant for the estimation proceeding.

20   That's number one.

21        Responding to the suggestion that because the federal

22   bankruptcy judge in North Carolina was once a law clerk to the

23   judge who decided *Garlock*, I think counsel stopped just short

24   of making an accusation, but I think the implication that there

25   is something somehow improper by virtue of the fact that the

1  bankruptcy judge has experience in prior bankruptcy cases is

2  inappropriate.  And I won't go further with that.

3          Counsel was dead wrong when he asserts that getting

4  claims from the DCPF gets you most of what you would want from

5  around the country because of the number it serves.  The DCPF

6  contains 10, 10 of the trusts of the 60 that there are

7  nationally.  So less than 20 percent, whatever that works out

8  to, 17, 18 percent.

9          THE COURT:  Are they larger ones or not larger ones,

10  or they're all big and it doesn't matter?

11          MR. WALDREP:  The 10 in Delaware are large but there

12  are others that are also large, I think, is the best way to put

13  it.

14          THE COURT:  Sure.

15          MR. CURLETT:  Counsel is also dead wrong when

16  suggesting that Judge Hodges limited the Rule 2019 statements

17  and how those should be handled.  I know he says they read it

18  that way.  I'd like to know what they're reading that way, but

19  we think that Judge Hodges absolutely did not do that.  And the

20  protections that are in place in the various cases do not

21  preclude the attorneys from obtaining the discovery.

22          Even if the discovery --

23          THE COURT:  Hold on.  When you say "obtaining the

24  discovery," do you mean whether the Angelos firm can turn over

25  its R2019 notices to you?

```
1              MR. CURLETT:  Correct.

2              THE COURT:  Okay.  In your view, there's no

3    restriction imposed --

4              MR. CURLETT:  There's no restriction anywhere in the

5    litigation upon which Angelos can rely to say that they can't

6    turn over these documents to us in response to our subpoena.

7              Additionally, Your Honor, subpoenas are the only

8    practical means for Bestwall to obtain the discovery it needs

9    with respect to these selected plaintiffs.  To obtain just the

10   trust claims, for example, by alternative means, Bestwall would

11   have to serve more than 60 separate subpoenas to the individual

12   trusts in the various jurisdictions and would almost certainly

13   face separate motions to quash with respect to each subpoena.

14             Likewise with the 2019 statements, Bestwall would

15   have to make a request for access in each of the bankruptcy

16   courts where the exhibits are filed off the public docket.  And

17   assuming such a request is successful, review each of the

18   statements to determine whether or not the selected plaintiffs'

19   names were included.

20             THE COURT:  So I just want to make sure I'm

21   understanding your point.  So for any one of the selected

22   plaintiffs identified in your subpoena out of the seven -- so

23   take any one of them -- if you wanted to find out trust claims,

24   you would have to send 60 subpoenas to the 60 trusts because

25   you wouldn't know otherwise in which ones that particular
```

1    claimant has made a claim?

2          MR. CURLETT:  That's correct, Your Honor, because the

3    law firms are the hub.  So we can go to one law firm and say:

4    These are the plaintiffs that asserted claims against Bestwall,

5    and we want to know what information was disclosed in discovery

6    in those underlying cases.  And for Angelos to say, "No, go get

7    it somewhere else because we're concerned about protecting the

8    information in the litigation" is not a valid basis to refuse

9    to honor the request because of the burden that it places on us

10   to go get it.  It's just not -- it cannot practically be done.

11         The simplest way is to do what we have done which is

12   to say give us the nonprivileged, not-protected information in

13   the form of the trust claims, the ballots, and the Rule 2019

14   statements.

15         Bestwall, regardless of which approach it takes,

16   whether it's to go get these documents directly from the firm

17   or to spend the next five years running around the country

18   litigating in multiple forums, Bestwall still needs to depose

19   Angelos concerning those documents.  And any --

20         THE COURT:  When you say "depose Angelos," you mean a

21   representative of the firm?

22         MR. CURLETT:  Correct, Your Honor.  Any time I say

23   Angelos, I'm not referring to Peter Angelos or his sons; it is

24   a reference to the law firm.  Then any inconsistencies with

25   disclosures in the tort case.  That's what we're looking for.

1    Plainly the burden of the law firm complying with the subpoenas

2    is minimal by comparison and judicial economy favors pursuing

3    discovery through the subpoenas.

4            I'd like to focus for a moment on one of the cases,

5    one of the selected plaintiffs.  That's the matter of *Warfield*.

6    Because I think that it is illustrative of many of the issues

7    that we've seen and particularly when we look at some of the

8    documents that were relevant there.  But for context -- and I

9    think it's also important because it's the underpinning and

10   establishes Bestwall's good faith in issuing the subpoena

11   supported by Angelos' abusive discovery in the case of *Warfield*

12   *v. Union Carbide*.

13           In this case Angelos failed to disclose material

14   evidence about alternative -- alternate exposures, exactly the

15   conduct that was found in the *Garlock case*.  *Warfield* was a

16   2006 case in the Baltimore City Circuit Court and William

17   Warfield was represented by Angelos.  In 2011, five years after

18   the case was filed and only two days before trial, Angelos

19   disclosed significant evidence of exposure to forms of asbestos

20   that were not attributable to Bestwall or Union Carbide, which

21   exposures Angelos knew about throughout the life of the case.

22   This evidence was contained in bankruptcy trust claims forms.

23   That's where the evidence was contained.

24           Angelos is disputing that the trust claim forms will

25   contain relevant information, but here this plainly establishes

1   that it does.

2          THE COURT:  When you say Angelos disclosed

3   significant exposures, disclosed them to Bestwall or --

4          MR. CURLETT:  Bestwall had already settled -- or GP

5   had already settled, so they were disclosed to Union Carbide.

6   As I'll explain in a moment, Bestwall was forced to depose

7   Mr. Warfield without having the benefit of this information and

8   settle its case without having the benefit of that

9   information.

10          In its complaint Warfield alleged exposure to

11   asbestos attributable to Union Carbide as well as a joint

12   compound produced by Georgia-Pacific.  He alleged his only

13   exposures took place between 1965 and 1985.  This was the

14   period of exposure to all forms of asbestos, not just GP or

15   UCC.  This is a position that Angelos maintained until the eve

16   of trial.

17          Then on the eve of trial, Angelos disclosed trust

18   claims forms that showed Warfield had signed affidavits under

19   oath in 2006, claiming that he had been regularly exposed to

20   asbestos products attributable to other manufacturers from 1947

21   to 1985 and also from 1965 to 1991.  Mr. Warfield was deposed

22   in 2007.  None of this information was disclosed prior to his

23   deposition, and in his deposition Mr. Warfield denied any

24   exposure other than that alleged in the complaint.

25          THE COURT:  Who was he deposed by, Union Carbide?

1          MR. WALDREP:  GP, Union -- I think all counsel in the

2     case at the time, and he died soon after his deposition.

3          If Your Honor looks at the slide appearing on the

4     screen, just to illustrate the point I'm making, prior to

5     Warfield's deposition, Warfield executed two certified

6     Statement of Exposure affidavits to support the trust claims.

7     One for Celotex in 2006 and one for National Gypsum also in

8     October 2006.  At least six trust claims were filed for

9     Warfield:  Celotex, Eagle-Picher, Manville, HK Porter, National

10    Gypsum, Babcock & Wilcox.

11         Notwithstanding all of these filings in 2006 and one

12    in 2007, when Warfield was deposed on January 25, 2007, he was

13    asked:  "Sir, have you, in the course of this lawsuit been

14    required to fill out any affidavits or forms for, like, a

15    bankruptcy trust?"  And he answered incorrectly:  "No."

16         Both before and after Warfield's deposition, Angelos,

17    representing his estate, made claims against multiple

18    bankruptcy trusts based on claims of asbestos exposure not

19    disclosed in the tort litigation against Bestwall.  Angelos in

20    his papers first seeks to downplay the litigation abuse in

21    Warfield by repeating its argument that a trust claim does not

22    constitute evidence of exposure, but that is false, as

23    Warfield's own trust claims show.

24         These are the trust claim forms that were attached to

25    Union Carbide's motion for sanctions.  As the Court can see,

1    the claims forms contain numerous admissions of Warfield's

2    exposures to particular asbestos-containing products for which

3    trusts are responsible and were supported in some cases by

4    Warfield's own affidavit concerning those exposures which was

5    not disclosed before Warfield's deposition and death.

6            Looking at this slide, Your Honor, you'll see this

7    affirms that the exposure began in 1947 and ended in 1985.

8    This is for Eagle-Picher.  At the bottom of the page also

9    highlighted, it shows the type of exposures -- the types of

10   products to which he was being exposed.

11           The significance of this slide in particular, Your

12   Honor, is it establishes that his exposure began 20 years

13   before the exposure he alleged in the tort case.

14           In the Celotex, occupational exposure to Celotex or

15   Carey Canada products or operations, year exposure began 1965.

16   The year it ended, 1991.  Six years after the period of time

17   that was alleged in the complaint in the tort case.  And this

18   is significant because it impacts Maryland's cap on noneconomic

19   damages by changing that time frame.  This is exactly the kind

20   of evidence that the *Garlock* court relied on in rejecting the

21   settlement-based estimation.

22           The reply in the second declaration by Mr. Volta

23   vaguely states the law firm corrected any erroneous claim forms

24   that had been submitted on Mr. Warfield's behalf, and the firm

25   amended Mr. Warfield's interrogatory answers to conform with

1    the information provided in the correct claim forms.

2            Even if this were true, it's beside the point.  The

3    fact remains that the Angelos firm failed to disclose exposure

4    evidence that prejudiced the defendants in the case.  The

5    defendants did not have Mr. Warfield's affidavits in support of

6    trust claims that materially departed from his deposition

7    testimony and discovery responses before his deposition and

8    death.  Nor does the affidavit explain when or how claim forms

9    or interrogatory answers were corrected or confirmed, what the

10   nature of those corrections were, and whether the corrected

11   forms contained material exposure evidence that had not been

12   disclosed to GP before it settled.  Nor does the affidavit

13   explain how any such corrections fix the prejudice to GP when

14   GP had settled before the claim forms were ever produced on the

15   eve of trial against Union Carbide.

16           Turning now to the significance of the trust claims

17   forms.  What was presented today was a sample ballot and a

18   sample ballot in which certain information about the trust

19   claim was not provided, but that's a different case, and in

20   that case that contains sample forms, there was a questionnaire

21   ordered by the Court to follow which would contain all of the

22   information.  So that is a red herring and separate from what

23   we're talking about here in the way these claims are normally

24   handled.

25           THE COURT:  So unlike Exhibit 1 which is a standard

1    proof of claim form, the trust claim forms can take different

2    forms depending on the trust?

3          MR. CURLETT:  That's correct, Your Honor.

4          All right.  Federal and state courts have routinely

5    held that claims submitted to asbestos bankruptcy trusts are

6    discoverable.  *Willis v. Buffalo Pumps*.  I even put that on a

7    slide appearing at Your Honor's left.

8          The reply argues that trust claims do not contain

9    evidence of plaintiffs' exposures to trust asbestos-containing

10    products.  It is false that trust claims do not contain

11    exposure evidence.  This is logical.  Trusts only pay claims of

12    persons who were exposed to the trust products.  So they

13    therefore universally require meaningful and credible evidence

14    of exposure to the trust products.

15          The only document that Angelos cites in support of

16    its position is a brief filed by the Asbestos Claims Committee

17    in Bestwall's bankruptcy case, but that brief which they site

18    has no citations itself.  Exhibit E to Exhibit A to Angelos'

19    reply is a brief filed by Bestwall in its bankruptcy case, and

20    it contains an excerpt from one trust procedure showing the --

21    that the trust requires meaningful and credible evidence of

22    exposure.  And it's before Your Honor on the screen.  AWI

23    Exposure, "The claimant must demonstrate meaningful and

24    credible exposure which occurred prior to 1982 to asbestos or

25    asbestos products," et cetera, et cetera.

1         Courts in asbestos litigation know trust claims are

2   meaningful.  Courts routinely compel discovery of trust claim

3   forms.  Courts have also repeatedly found a failure to disclose

4   trust claims and related information is prejudicial.  We

5   summarize those cases in footnotes 12 and 37 of our response.

6   Many courts in states now require disclosure of trust claims

7   now as a matter of routine.  Those are summarized in footnotes

8   38 and 39 of our response.  One of those courts is the Circuit

9   Court for Baltimore City.

10         If Your Honor looks at the slide now appearing to

11   your left -- I see you're doing that -- Baltimore court

12   requires disclosure of trust claims in asbestos cases.  We have

13   confirmed this is the current order in effect in Baltimore

14   City.  60 days before the date set for trial but no later than

15   whenever:  "Plaintiffs produce all claim forms and any exposure

16   affidavits or statements submitted to any bankruptcy entity or

17   trust in connection with or during the pendency of this lawsuit

18   and supplement that information every 30 days thereafter."

19   This is not secret information.  This is regularly discoverable

20   information in the bankruptcy -- in the asbestos context.

21         The issue of whether trust claims are meaningful was

22   also fully litigated in *Garlock*, and the Court found trust

23   claims are meaningful and contain relevant exposure evidence

24   because the trusts require meaningful and credible evidence of

25   exposure.  Findings about trust claims that were not disclosed

1    were fundamental to the *Garlock* court's billion-dollar

2    decision.

3           Angelos has also argued that it is somehow sufficient

4    for Bestwall to know what the trusts pay claimants if they

5    assert claims, but we're not interested, Your Honor, in what

6    the trusts pay claimants.  We're interested in what the

7    selected plaintiffs told the trusts about their exposure.

8    That's the information we don't have, and that's the

9    information that we need from Angelos.

10          THE COURT:  Although in number 2 of your document

11   subpoena, you ask for documents sufficient to show the status

12   of any claim asserted against the trust by a selected

13   plaintiff.  Doesn't that get into --

14          MR. CURLETT:  In the trust context, Your Honor, there

15   are typically four categories of status that are assigned to

16   any particular claim:  pending, resolved, paid -- I think

17   there's one other.  But it is a categorical distinction that's

18   made in those cases and does not implicate privileged or

19   confidential information.

20          THE COURT:  Okay, so you're just looking for one of

21   those four words, whatever the four words are.

22          MR. CURLETT:  Correct.

23          Turning to bankruptcy ballots, another category of

24   documents that we seek.  Angelos again cites that ACC brief for

25   the proposition that the purpose of ballot submissions is

1    to allow the bankruptcy court to account for all potential

2    claims, to ensure successful reorganization of the debtor's

3    estate.  Again, that brief contains no citations in support,

4    and the statement is false on its face.

5           Simply put, bankruptcy courts require the claimants

6    who are voting on bankruptcy plans to have exposure to the

7    debtor's products.  Again, it's logical because otherwise the

8    claimant has no claim and, therefore, would have no business

9    affecting whether a plan will be approved.  In 2015 the firm

10   voted to reject the *Garlock* plan on behalf of thousands of

11   claimants, including three of the selected plaintiffs in this

12   case, Brittingham, Blair and Warfield.

13          In the ballot an attorney from the firm certified

14   under penalty of perjury to the best of his knowledge,

15   information, and reasonable belief, that among other things,

16   the claimants in the exhibit, quote, were exposed to asbestos,

17   released from asbestos-containing gaskets, or packing

18   manufactured, produced, fabricated, distributed, supplied,

19   marketed or sold by *Garlock*.  Looking at the -- in the ballot

20   in that case, we see that it contains evidence of exposure,

21   again, underscoring the significance and the importance and the

22   relevance of these ballots.  The highlighted portion reads:

23   "The injured parties listed in the accompanying exhibit were

24   exposed to asbestos released from the gaskets, packing

25   manufactured," et cetera, et cetera.  That's the GST asbestos

1    exposure.

2            And also responding to the argument if the *Garlock*

3    judge ordered 2019 disclosure form discovery, so again, this is

4    all discoverable information.

5            Then the third category of the documents, if I may,

6    Your Honor, are the Rule 2019 statements.  The reply claims

7    that Rule 2019 statements are merely statements of

8    representation by counsel with no significance.  This is belied

9    by the language of Angelos's own Rule 2019 filings, and Your

10   Honor can see here paragraph 5 which we've highlighted:  The

11   creditors hold either unliquidated claims or claims in varying

12   amounts for monetary damages due to personal injury caused by

13   the debtors for manufacturing, marketing, distributing,

14   selling, installing, et cetera, et cetera, specifying the use

15   of asbestos or asbestos-containing products.

16           THE COURT:  And is this, Mr. Curlett, Angelos'

17   standard Rule 2019 as best you can tell?  Or is that in a

18   particular case that may or may not be the same in others?

19           MR. CURLETT:  This is the one from multiple cases,

20   Your Honor.  We don't have them all, but it's more than just

21   this one.

22           THE COURT:  Okay.

23           MR. CURLETT:  Even apart from the language of these

24   statements, it is independently significant that a claimant was

25   participating through counsel in a case of a defendant whose

1  products had not been disclosed in the tort case.  Why would

2  the claimant be participating in a bankruptcy case if he or she

3  didn't have a claim against the company and exposure to its

4  products?  Angelos' arguments that Bestwall must go to the

5  courts to obtain these 2019 statements is incorrect and belied

6  by the very decision Angelos cites for this point which we

7  review in our opposition brief at page 19, which made clear

8  that a party seeking these statements may seek access from the

9  courts or request them in discovery.  Either/or.

10         We have elected the latter for purposes of judicial

11  economy and practicality, as we've reviewed.  The *Garlock*

12  bankruptcy court did order the plaintiff law firms to produce

13  Rule 2019 statements.

14         I believe at this point, Your Honor, I responded to

15  all of the trust claim forms and related issues that arose.

16         THE COURT:  I think you have, but let me keep you up

17  there and ask some questions regarding the sort of specific

18  scope of what you are requesting in the subpoenas.  I could not

19  tell from your brief, because some of your requests, I think,

20  can be read quite broadly to require what I would describe as

21  burdensome searches of firm records for many, many years or

22  could be read narrowly to the extent that Bestwall is intending

23  to limit its request just to the particularized claim files for

24  these selected plaintiffs.

25         Is Bestwall limiting what it's requesting to the

1   claim files for these selected plaintiffs?  And at this moment,

2   I'm not talking about the trust claim form and the ballots and

3   the Rule 2019 statements which do not present these same

4   issues.  But the ones I'm worried about are the ones where it

5   says any documents for this or any documents for that.  In

6   theory, that could require extensive ESI searches, extensive

7   file searches and things of that nature.

8          MR. CURLETT:  We do not intend our document request

9   to require any such efforts on the part of Angelos.  Our

10  requests are limited to these seven selected plaintiffs, and we

11  believe that all of the information we are requesting should be

12  in those files individually.

13         THE COURT:  So will a search of those individual

14  claim files suffice with respect to what they have to undertake

15  to respond to your subpoenas?

16         MR. CURLETT:  Yes, Your Honor.

17         THE COURT:  All right, that is helpful.

18         Now let me just go through.  No. 1, we've talked

19  about.  No. 2 is documents sufficient to show the status of any

20  claim.  You have just told me that you're looking for basically

21  one of four words.  Is there some particular document

22  containing those words that you are looking for, or are you

23  essentially just looking for some representation to be made as

24  to the status of those seven claims -- or the claims for those

25  seven people?

1          MR. CURLETT:  The latter.

2          THE COURT:  Just some representation to be made.

3          MR. CURLETT:  Correct.

4          THE COURT:  All right.  Now looking at 5, 6 and 7.

5    No. 5 is any documents through which the firm or the selected

6    plaintiff disclosed to Bestwall evidence of any selected

7    plaintiff's exposures to asbestos.  Can you tell me a little

8    bit more?  Presumably you have your own file.  What are you

9    trying to get at here?

10         MR. CURLETT:  So the critical issue is ensuring that

11   everybody in this litigation has the same complete set of

12   documents.  By specifying that these are documents that have

13   previously been provided to Bestwall ensures that there is no

14   privilege issue.  We don't know what we don't know.  Whether

15   information is publicly available, whether it may have already

16   been produced prior is not a basis to assert that there's no

17   obligation to produce it.

18         I would cite *Morgan v. Safeway, Inc.* decided by Your

19   Honor in 2012 when serving as a magistrate judge:  Even

20   publicly available information might properly be the subject of

21   a valid request for production of documents.  I have other

22   cases but the principle, I think, is just because you can get

23   it somewhere else -- you may already have it -- is not a basis

24   to decline.  We're looking to ensure we have the complete set

25   of information so that we can take advantage of that in the

1    litigation.

2            THE COURT:  So what you're looking for there is for

3    them to pull the claim file for whichever selected plaintiff,

4    look in it, and if there's a letter to Bestwall or email or

5    some other communication, to produce that to you?

6            MR. CURLETT:  Correct.

7            THE COURT:  Okay.  Then No. 6 is disclosure to any

8    other party.  Again, I understand that was added in to make

9    sure that we're not talking about privileged information, but

10   what are you sort of envisioning there?  Obviously under your

11   theory, the trust claim forms, et cetera, I guess, would fall

12   under that category, but is there something else you're trying

13   to get at?

14           MR. CURLETT:  Oftentimes what will happen in asbestos

15   litigation, you'll have different lawyers for the tort cases

16   versus the trust cases.  So a firm representing a plaintiff in

17   a tort case may disclose evidence of exposure -- other forms of

18   exposure than are relevant in the tort case to, for example,

19   other law firms to whom they're referring the plaintiff to go

20   file a trust claim.  That would allow the lawyers in the tort

21   case to cabin their discovery obligations, in their view, to

22   the limited exposure.  Now I think that's incorrect and, in

23   fact, Judge Hodges in the *Garlock* case in responding to a

24   lawyer's assertion that "I did this because I'm trying to

25   maximize the value of my claim for my client," I think Judge

1    Hodges called it a perverse view of the ethical rules or

2    something to that effect.

3          What we're really trying to ensure is that when the

4    Angelos firm looks at the files related to these selected

5    plaintiffs, that we are obtaining the documents that reflect

6    the exposure, if any, to multiple forms of asbestos.  And that

7    may include disclosure to third parties.

8          THE COURT:  I guess my concern there, is there any

9    kind of, for lack of a better word, joint defense privilege?

10   If the communication was going from one lawyer to another

11   lawyer representing the same client, is there any --

12         MR. CURLETT:  What I would say is this, Your Honor.

13   If there's a privilege that would cover the production of a

14   document that might otherwise be responsive, we don't want it.

15   We're not seeking to encroach.  If the Court's order makes that

16   clear by specifying it, we are perfectly fine with that.

17         THE COURT:  Similar type of question with respect to

18   No. 7 which is kind of a broad catchall situation --

19         MR. CURLETT:  It is a catchall.  It was designed to

20   be a catchall.  It is not designed to increase the burden on

21   the firm in any way.

22         THE COURT:  Are you looking for privilege logs and

23   things of that -- as to these last two, it does seem to me

24   there are conceivable interpretations that would incorporate

25   potentially privileged material.

1     MR. CURLETT:  We are not looking to engage in the

2  type of discovery litigation that would require the production

3  in litigation over a privilege log.  We're looking for

4  something far simpler.  We want the documents that are not

5  privileged and not protected by attorney work product that

6  contain evidence of multiple exposures to asbestos.

7     THE COURT:  You're willing to defer to the Angelos

8  firm to decide what is privileged and what might be subject to

9  attorney work product?  With exception of the items listed

10  above: the trust claims forms, the ballots, et cetera, or

11  disclosures to Bestwall?

12     MR. CURLETT:  Yes, yes.

13     THE COURT:  That is helpful as to the document

14  subpoenas.  Let's take a look, while I have you there, at the

15  list of matters for 30(b)(6) examination.

16     All right.  You have settlement negotiations and

17  other communications between the firm and Bestwall with respect

18  to claims by selected plaintiffs.  That seems certainly

19  straightforward and not privileged.  Again, I guess my concern

20  is in terms of preparation of this witness, some of these

21  negotiations were quite some time ago.  I'm not sure who the

22  witness will be and what their information is.  What sort of

23  preparation are you anticipating this person to have?  Is that

24  going to require extensive reviews of ESI or other information

25  other than what's in the claim file to be able to answer your

1   questions?

2          MR. CURLETT:  I think that the deponent can be

3   expected to be familiar with the documents that have been

4   produced in response to the document subpoena.  I do not

5   envision trying to find a back door into imposing a burden on

6   the firm to go conduct the kind of exhaustive discovery

7   searches that we're not looking for.

8          THE COURT:  Okay.  So because -- well, although this

9   is a little bit broader because I'm not sure necessarily that

10  settlement negotiations would necessarily fall under what's

11  being produced with the document subpoena.  Because you have

12  documents through which the firm disclosed to Bestwall evidence

13  of exposures to asbestos, there may be settlement negotiation

14  documents that don't contain that sort of substance, right?

15  "I'll pay you X amount of money," that doesn't say anything

16  about exposure to asbestos.

17         MR. CURLETT:  I would expect in my litigation

18  experience that when you're in a settlement negotiation,

19  there's going to be correspondence between the parties

20  reflecting the ongoing settlement positions.  That's what we're

21  looking for and I think what's critical here.

22         THE COURT:  I'm focusing specifically on what we're

23  expecting the person to review.  My concern is you originally

24  said the documents that are being produced pursuant to the

25  document subpoena; I'm not sure that settlement negotiation

1   documents are necessarily in that group.

2          MR. CURLETT:  May I have the Court's indulgence for

3   one moment?

4          THE COURT:  Yes.

5          MR. CURLETT:  We would limit our request to

6   information that is known by the firm at this time.  So if, for

7   example, the lawyer who was involved in settlement negotiations

8   was still at the firm, the plaintiff could sit down with them

9   and talk to them about what happened in the case.  Any

10  information that is not currently in the possession, custody,

11  and control and institutional knowledge of the firm is beyond

12  the scope of what we are seeking.

13         If, for example, an attorney representing someone who

14  had been with the firm, has since left, we are not asking the

15  Court to impose any obligation for the deponent to reach

16  outside the organization to obtain that information.

17         THE COURT:  Again, though, what about looking up the

18  emails of that attorney who's now left or digging through that

19  attorney's files?  These are the sorts of efforts that I'm

20  trying to figure out what's being expected.

21         MR. CURLETT:  Well, I think part of a client file

22  includes -- again, this is -- sort of thinking this through in

23  response to Your Honor's question.  We don't want protected

24  attorney work product.  So what we're talking about are

25  communications between Angelos and Bestwall.  I think by that

1  very definition, the searches and the review of the client file

2  is limited -- is limited.  Full stop.

3         THE COURT:  So you're looking for the person to

4  review the client file and that's it?

5         MR. CURLETT:  Correct.

6         THE COURT:  For settlement discussions, nothing

7  further.

8         MR. CURLETT:  Correct.

9         THE COURT:  All right.  Number 2 is this Dahlgren

10 article which is the subject of sort of a separate section of

11 the briefing, and I'm a little bit perplexed as to exactly what

12 you're looking for.  You're asking for use of the article in

13 cases against Bestwall.  Wouldn't Bestwall already know whether

14 the article was or was not used against it in a particular

15 case?

16        MR. CURLETT:  Well, I think it would know whether or

17 not it was used.  I think the deposition would probe the

18 decision-making process of -- I don't want to --

19        THE COURT:  That's getting into attorney work

20 product.

21        MR. CURLETT:  As I'm saying it, I realized that.  I

22 don't want to overstep.  If I may have one moment.

23        THE COURT:  Sure.

24    (Attorneys conferred.)

25        MR. CURLETT:  Your Honor, I am informed that there

1   has been an assertion in the bankruptcy litigation that the

2   Dahlgren article was rarely used against Bestwall.  Bestwall

3   has information and knowledge about the use of its -- of that

4   opinion in its cases.  I think what is significant for Bestwall

5   is to obtain an admission in the deposition that it was, in

6   fact, used against Bestwall for evidentiary purposes in

7   subsequent litigation in the bankruptcy.

8           THE COURT:  But if it was used -- so you already have

9   transcripts or briefs that were filed in the various litigation

10  showing that it was used, and you just want somebody to say

11  yes?  "Here's the brief, you" -- Angelos firm -- "filed?  You

12  used it, right?"  And you want the person to say yes?

13          MR. CURLETT:  Correct.  Because that has evidentiary

14  significance to my clients.

15          THE COURT:  Okay.  So you're not anticipating the

16  person doing really any independent preparation for this.  You

17  are going to show them -- you're not asking them to ferret out

18  when it was or was not used.  You just want the person to be

19  prepared to answer a question when presented with a document

20  showing its use?

21          MR. CURLETT:  That's correct.

22          THE COURT:  All right.  That's helpful.

23          Number 3 is, again, "any evidence in the possession

24  of the firm concerning exposures to asbestos."  This is quite

25  similar to your catchall in terms of documents to be produced,

 1    and I guess I had the same concern, although with respect to

 2    the document production, you said you're not anticipating

 3    anybody looking at things other than what was just produced --

 4              MR. CURLETT:  I think it's a hazard of the profession

 5    that there is no litigator that can prepare a discovery request

 6    without including a catchall provision out of abundance of

 7    caution.  Before Your Honor and for what we're seeking here, I

 8    think we've made plain and clear what we want and what we don't

 9    want.  We don't want anything that encroaches on privilege or

10    other protections.

11              THE COURT:  So in terms of what you would expect the

12    person to review, you're expecting them to review the documents

13    that are being produced as to that catchall.

14              MR. CURLETT:  Correct.

15              THE COURT:  All right.  Next we have trust claims,

16    Rule 2019 statements and ballots.  We've already gone over

17    those.

18              The last one is disclosures -- I'm sorry, not quite

19    the last one.  Last one on this page.  "Disclosures made to the

20    debtor or other asbestos defendants in discovery in the tort

21    system."  So this is definitely going to be way broader, I

22    would think, in terms of what the person is going to have to

23    review because disclosures made to the debtor would be fine

24    because that would be in the claim file that's being looked at.

25    Do you mean other asbestos defendants in the same cases?

1          MR. CURLETT:  Your Honor, co-counsel has refreshed my

2    recollection as to the basis of this point.  What happens in

3    many of these cases is Bestwall settles and gets out of the

4    case, but the case continues.  So to the extent that there was

5    discovery produced in those cases where we're out -- like the

6    Warfield case.  We settled, we're out, and then later in the

7    case information is produced to Union Carbide -- trust claim

8    forms are produced to Union Carbide showing multiple exposures.

9    That is certainly information that is germane to what we're

10   seeking.

11         THE COURT:  When you say "in the tort system," you

12   mean in the case against Bestwall and others in the tort

13   system?  If it so happens that there was more than one case

14   involving a particular claimant -- and I don't know whether

15   that ever happens or not in asbestos litigation, maybe they

16   roll all their claims into one case.  But we're talking about

17   looking at this particular plaintiff's file which should give

18   all of the responses --

19         MR. CURLETT:  Correct, because we're still only

20   talking about the seven selected plaintiffs.

21         THE COURT:  And just the information in their

22   particular claim file?

23         MR. CURLETT:  Yes.  I was going to ask for more, but

24   I got overruled by co-counsel.

25         THE COURT:  All right.  No. 8:  Any evidence of any

1   exposure to asbestos presented at trial in the case of any

2   plaintiff.  Again, do you have trial transcripts?  It would

3   seem like that's something that you probably would already

4   have?

5          MR. CURLETT:  It's possible, Your Honor, that those

6   cases continued against other defendants after Bestwall

7   settled, and we are interested in knowing what was disclosed in

8   that context.  But, again, it's limited to these case files for

9   these selected plaintiffs.

10         THE COURT:  I guess the concern I have with that,

11  though -- and I don't know how the Angelos firm keeps its case

12  files -- it may not be that evidence presented at trial is

13  necessarily maintained in some logical fashion in the case

14  file.  What I'm trying to do is avoid something that would

15  impose some sort of burden on the Angelos firm to go back and

16  reconstruct, sort of, evidence that was presented at trial or

17  order trial transcripts which could just as easily be ordered

18  by Bestwall, that sort of thing.

19         MR. CURLETT:  I think I'll start with sort of the

20  foundational premise that we're not asking for anything that

21  isn't currently in the possession, custody, or control or

22  institutional knowledge of the firm.  If it's not contained in

23  the files that they have and if it's not known by the lawyers

24  currently working at the firm, we are not seeking to impose any

25  obligation on Angelos to go further than that.

1          THE COURT:  Okay.  So you're looking for what's in

2     the claim file or what's known by current lawyers employed by

3     the firm.

4          MR. CURLETT:  Right.

5          THE COURT:  Similarly with respect to "public

6     statements made by the firm, its lawyers or its employees,"

7     look at the claim file, talk to the current lawyers?

8          MR. CURLETT:  Yes, yes.

9          THE COURT:  Then "any co-counsel, referral or joint

10    representation arrangement or agreement," can you tell me the

11    basis for that request.

12         MR. CURLETT:  That's the one that relates to the

13    comment I was making earlier.  I may have called to mind this

14    one in response to the Court's earlier question about how --

15    but, again, you see what we're calling for, but to the extent

16    that those communications would be privileged or protected by

17    attorney work product, we're not interested.  Nor are we

18    demanding a privilege log.

19         THE COURT:  Can you tell me how that is relevant

20    to --

21         MR. CURLETT:  Sure.  So if Angelos represents

22    selected plaintiff number one and files a lawsuit in tort

23    against Bestwall and in the discovery process discloses nothing

24    more than the exposure to Bestwall's product, but then Angelos

25    does not continue to represent that plaintiff but instead

1    refers the plaintiff out to other firms to assert trust claims

2    which reveal other -- evidence of other exposures to other

3    forms of asbestos by other manufacturers and we didn't get it

4    in the discovery process because it was concealed, that's

5    problematic.  So that's what we're asking for.

6              THE COURT:  Okay.

7              MR. CURLETT:  But we think also that those

8    communications, that evidence would be in the client file --

9              THE COURT:  -- claim file.  All right, thank you.  I

10   think that answers all of my specific questions unless you

11   think I missed anything.

12             MR. CURLETT:  I don't think so, Your Honor.  Thank

13   you.

14             THE COURT:  All right.  Mr. Waldrep.

15             MR. WALDREP:  Your Honor, I wrote down a number of

16   things I would like to say to you, but I wondered if I might

17   ask the Court's indulgence for a ten-minute break so I might

18   consult with my client.

19             THE COURT:  That sounds like a good idea.  We'll take

20   a ten-minute recess and come back at noon.

21             MR. WALDREP:  Thank you, Judge.

22             THE CLERK:  All rise.  This Honorable Court stands in

23   recess until noon.

24       (Recess taken at 11:48 a.m.)

25       (12:03 p.m.)

1          THE COURT:  All right, Mr. Waldrep.

2          MR. WALDREP:  Your Honor, thank you for the

3    opportunity to talk to my client.

4          THE COURT:  Sure.

5          MR. WALDREP:  First thing I need to say, Your Honor,

6    is that I implied nothing about Judge Hodges and Judge Beyer

7    other than she was his law clerk during the *Garlock* case, and

8    that's true; she was.  I said the two cases, *Garlock* and

9    Bestwall, are outliers and they are, in the sense that they

10   have embraced this concept of fraud in the asbestos world.  So

11   I stand by those statements and I implied nothing further about

12   it.

13         Your Honor, in the last session with opposing

14   counsel, we got into a lot of issues, and I heard some

15   concessions that I was very happy about.  I think I heard

16   concessions, and I understand where the Court is going with

17   this.  I hopefully can read the room and see where we're

18   headed.

19         I will say though that the *Shelton* case, which I have

20   urged this Court to apply to the situation as the *Monster* case

21   did and as the *Desert Orchid* case did, the first factor is you

22   can't get it anywhere else.  Here I will quote opposing counsel

23   who says, "They want to put the burden on us to go get it."

24   Well, they can get it.  They can get trust claims from trust.

25   They can get 2019 statements from courts, and a lot of the

1    information, especially settlement information, they already

2    have.  They admit they already have it.

3           And so this boils down to, "Well, we don't know if we

4    have everything, so we want to compare what we already have

5    with maybe what you have," and I would suggest that that in

6    other cases might open Pandora's box if we're going to allow

7    opposing counsel to do that.

8           A few words about the *Warfield* case that they talked

9    about.  This won't take but a minute, Your Honor.  The trust

10   claims in *Warfield* neither change nor affected Mr. Warfield's

11   claims of exposure to Bestwall.  They didn't change Bestwall's

12   liability to Mr. Warfield.  You see the affidavit, you know

13   that it addresses the correction of errors, interrogatory

14   answers, and the law firm did not oppose postponing the trial

15   against Union Carbide, not against Bestwall, and all defendants

16   settled.  Maryland, as this Court knows, is a joint and several

17   liability jurisdiction.  So it could not have affected

18   Bestwall's liability to Mr. Warfield.

19          Dahlgren, you talked with opposing counsel about

20   Dahlgren.  This is an article written -- gosh, I don't know how

21   many years ago -- about three plaintiffs.  There were three

22   cases, like a case study of three asbestos plaintiffs that

23   Mr. Dahlgren wrote his article about.  First and most

24   significantly, Bestwall does not allege that the law firm has

25   ever used the Dahlgren article.  They don't allege that.

```
 1            THE COURT:  I assume if you haven't used it, then
 2   they'll have nothing to show the witness to say, "You used it
 3   here," right?  I mean, if that's their intent --
 4            MR. WALDREP:  Yes.  For point of clarification on
 5   that, would a witness -- would the witness for the law firm,
 6   whoever, a 30(b)(6) witness, would they have to ask an expert
 7   that may have been used in the case whether that expert had
 8   relied, or is it in the context of, like, presenting the
 9   Dahlgren article in court?  We're just trying to understand
10   what our burden is, Your Honor, with that.
11            THE COURT:  I'm assuming, Mr. Curlett -- perhaps you
12   can weigh in here -- that you would be looking at a trial
13   transcript that would say Dahlgren article was introduced, and
14   you would say to the representative of Angelos, "Did you
15   introduce this in evidence in this trial?"
16            MR. CURLETT:  Yes, or a discovery response that may
17   acknowledge it.  That's it.
18            THE COURT:  So you would be showing them either a
19   trial transcript or a document that was filed by the Angelos
20   firm and saying, "Did your firm introduce this or use this as a
21   response?"
22            MR. CURLETT:  Discovery response may not have been
23   filed with the court but a litigation document certainly.
24            THE COURT:  Correct.  Hypothetically if there's a
25   circumstance in which you, Mr. Curlett, have a trial transcript
```

1   that might not be in the case file that is being reviewed by

2   the 30(b)(6) witness -- I'm trying to think through how that

3   would pan out because it --

4          MR. CURLETT:  We can give the documents that we plan

5   to use in the deposition ten days before the deposition takes

6   place.

7          THE COURT:  Okay.  So you would provide those

8   documents essentially to the other side for their use to

9   prepare.

10          MR. CURLETT:  Yes.

11          THE COURT:  Okay.  Does that answer your question,

12   Mr. Waldrep?

13          MR. WALDREP:  It does, Your Honor.  Thank you.

14          Your Honor, the Angelos firm has -- for each client

15   has up to three types of files which they call the litigation

16   file, the bankruptcy file -- because bankruptcy often follows

17   the litigation -- and finally the settlement file.  Litigation,

18   bankruptcy, settlement.  As I've understood the conversation

19   that occurred before the break, you're limiting to what's in

20   those files.  We don't have any other types of files.

21          THE COURT:  Correct, that's my understanding.  Is

22   that correct, Mr. Curlett?

23          MR. CURLETT:  It is.  On that point as we define

24   "file," it occurred to me this would be not just paper files.

25   So if the firm maintains its files, say -- we don't know how

 1    they maintain their client files.  Client files these days are

 2    maintained largely or almost exclusively electronically.  So

 3    for me personally, I may have a Redwell in my office with a few

 4    key documents that I use on a regular basis, for example, but

 5    the client file is in a client-identifying file on the NetDoc

 6    system which is what we use.

 7             So certainly when I say searches of ESI are not

 8    necessary, that's a separate issue.  But if their files are

 9    maintained electronically, the obligation to produce responsive

10    documents here extends to those as well.

11             THE COURT:  But only to those client files in their

12    electronic form, not to a broader search of the Angelos firm's

13    records?

14             MR. CURLETT:  Correct.

15             MR. WALDREP:  Your Honor, we appreciate that because

16    they've changed email systems a couple of times, and as has

17    already been noted, some of the attorneys that worked on some

18    of these files 20 years ago are deceased, and some of them

19    moved on to other firms.

20             THE COURT:  Yes.  As I understand the representation

21    that's been made, all that is being asked for is for Angelos to

22    search its case files, meaning litigation file, bankruptcy

23    file, and settlement file in either hard copy or electronic

24    form, whichever form that takes, and to speak with any live

25    attorneys remaining at the law firm who handled these matters.

1   If there are none for a particular selected plaintiff, then

2   there are none for that selected plaintiff.

3            MR. WALDREP:  That's my understanding as well, Your

4   Honor.

5            THE COURT:  Okay.

6            MR. WALDREP:  I have nothing else that I'd like to

7   bring to the Court's attention.  I just wanted some of those

8   clarifying statements to be made.

9            THE COURT:  Sure, I do appreciate that.  Okay.  Is

10  there anything else that anyone believes needs to be put on the

11  record here?

12           MR. CURLETT:  I would dispute the characterization of

13  the significance of joint and several liability, but I don't

14  think it's necessary.  Thank you.

15           THE COURT:  I agree with you there.  Okay.

16           As Mr. Waldrep kind of correctly predicted from the

17  line of questioning, I do think that the subpoenas have been

18  narrowed in significant and important ways here during today's

19  proceeding such that I do not find that there's any issues

20  regarding burdensomeness or privilege that are presented at

21  this point.  The requested inquiry is a relatively narrow one

22  in terms of what the parties are being asked to review and in

23  terms of the preparation that would be required by the 30(b)(6)

24  witness.  Bestwall has eliminated any privilege issues by

25  specifically stating that it does not require production of any

privileged information and does not even require production of

a privilege log or other information, so that inquiry will be

limited to nonprivileged information as defined by the Angelos

firm.

I do find that it is appropriate to produce the

various categories of what I'll call the form documents that

have been requested, meaning the trust claim forms, the master

ballots, and the Rule 2019 forms.  Let me say that if upon

further reflection the Angelos firm finds some particular

document from Judge Hodges or from some other judge suggesting

that there's some particular limitation that is not resolved by

my court order in terms of producing the Rule 2019 forms, then

please let me know, and I can certainly provide additional

paperwork or whatever we would need to get around that

particular restriction.  I certainly do not intend to create

any issues for counsel in terms of violating any other court's

order.

I have obviously heard the argument that the Angelos

firm made with respect to *Shelton*.  I am of the view that I do

not think *Shelton* prohibits the inquiries that are being made

here.  The Angelos firm is not opposing counsel in this

proceeding.  The information being requested, particularly as

it has now been narrowed, is of a very limited nature such that

I do not believe it constitutes an inquiry into the Angelos

firm's litigation procedures or anything else that could impact

1    or require disclosure of information that would be relevant to

2    the Angelos firm's representation of its ongoing clients in any

3    of these related matters.  I think the narrowing that has

4    happened today is extremely significant in terms of my analysis

5    of that issue as well.  So I do not believe that the *Shelton*

6    case is applicable in terms of the standard here and that it

7    would bar disclosure of the information that is being

8    requested.

9            I see that you just received a note, Mr. Waldrep.  Is

10   there a question that you have?

11           MR. WALDREP:  Excuse me, Your Honor.  I have to

12   interpret this.

13           THE COURT:  That's fine, yes.

14      (Pause.)

15           MR. WALDREP:  Again, point of clarification with

16   regard to the master ballots and the 2019s, you only want the

17   names of those seven plaintiffs?  You don't want the others,

18   20,000 people or however many?  We're limiting it to those

19   seven; is that correct?

20           THE COURT:  Mr. Curlett, is it fine to redact the

21   remaining persons?

22           MR. CURLETT:  Yes, Your Honor.

23           THE COURT:  Yes, so you may redact the other persons

24   and disclose the seven that are listed in the subpoenas.

25           MR. WALDREP:  Thank you.  I think that's appropriate,

1   Your Honor.

2           THE COURT:  All right, good.  Are there any other

3   clarifications?  Do the parties believe I need to put something

4   in writing, or can I just rely on the record that I have just

5   made with respect to the intents?  Or do you, Mr. Curlett, wish

6   to issue narrowed versions of the subpoenas that incorporate

7   sort of the restrictions that we have discussed here today?

8           MR. CURLETT:  We're satisfied relying on the record,

9   but if Your Honor would prefer the convenience of our preparing

10  a draft -- at the Court's discretion.

11          MR. WALDREP:  We're happy to rely on the record as

12  well, Your Honor.

13          THE COURT:  Okay.  I think we've made a fairly clear

14  record in terms of what is or is not to be produced.  Certainly

15  if any issues come up, the parties can reach out to me, and I'm

16  happy to clarify anything that needs to be clarified.  But I am

17  denying the motion to quash and/or modify except to the extent

18  that we have modified the subpoena here on the record today.

19          All right.  Is there anything else that needs to be

20  addressed in this matter?

21          MR. WALDREP:  No, Your Honor.  Thank you.

22          THE COURT:  Thank you.

23          Anything further, Mr. Curlett?

24          MR. CURLETT:  On the issue of timing and production

25  of deposition, we will gladly meet and confer with opposing

1    counsel.

2          THE COURT:  Okay.  Hopefully the parties are able to

3    work that out, but again, if not, let me know and we can get it

4    resolved.

5          MR. CURLETT:  Thank you, Judge.

6          THE COURT:  Thank you all.

7          THE CLERK:  All rise.  This Honorable Court now

8    stands adjourned.

9        (Proceedings concluded at 12:17 p.m.)

10

11

12    I, Patricia G. Mitchell, RMR, CRR, do hereby certify
that the foregoing is a correct transcript from the
stenographic record of proceedings in the above-entitled
13    matter.

14          Dated this 31st day of March 2022.

15                    *Patricia G. Mitchell*

16          _____
                Patricia G. Mitchell
17             Official Court Reporter

18

19

20

21

22

23

24

25

**< Dates >** .
**April 11** 11:23 .
**April 12** 11:24 .
**January 25** 46:12 .
**July 2020** 10:13 .
**March 15** 10:21 .
**March 4, 2021** 20:15 .
**November 2** 8:9 .
**October 2006** 46:8 .
**October 28** 11:4 .
**$1.3** 22:25 .
**$125** 23:2 .
**(12** 68:25 .
**(1203** 68:25 .
**(9** 2:2 .
**(958** 2:2 .
.
.
**< 1 >** .
**1** 48:25, 55:18 .
**1,500** 25:24, 26:4, 26:6, 26:7,
    27:7, 29:11 .
**1,501** 11:11, 12:14, 12:18, 24:20,
    25:3, 27:1, 27:5, 27:9,
    29:15 .
**10** 10:17, 41:6, 41:11 .
**100** 35:5, 35:6 .
**101** 1:49 .
**10:00 a.m.** 1:17 .
**11** 9:6 .
**11:48** 68:24 .
**12** 50:5 .
**12:17** 78:9 .
**15,000** 25:19 .
**15,200** 10:13, 10:18, 29:18 .
**17** 41:8 .
**17-BK-31795-LTB** 1:7 .
**18** 41:8 .
**19** 54:7 .
**1947** 45:20, 47:7 .
**1965** 45:13, 45:21, 47:15 .
**1982** 49:24 .
**1985** 45:13, 45:21, 47:7 .
**1991** 45:21, 47:16 .
.
.
**< 2 >** .
**2** 31:17, 31:18, 51:10, 55:19,
    62:9 .
**20** 35:7, 41:7, 47:12, 73:18 .

**20,000** 76:18 .
**2004** 4:2, 20:17, 20:22, 21:1,
    21:13, 21:14 .
**2006** 44:16, 45:19, 46:7,
    46:11 .
**2007** 45:22, 46:12 .
**2010** 28:5 .
**2011** 44:17 .
**2012** 56:19 .
**2015** 52:9 .
**2017** 7:1, 7:11, 8:4, 8:9 .
**2019** 19:22, 36:14, 36:17, 37:3,
    38:1, 41:16, 42:14, 43:13,
    53:3, 53:6, 53:7, 53:9, 53:17,
    54:5, 54:13, 55:3, 64:16,
    69:25, 75:8, 75:12 .
**2019s** 76:16 .
**2020** 10:6, 15:13, 15:15 .
**2021** 11:5 .
**2022** 78:17 .
**2023** 9:19 .
**204** 21:12 .
**21-CV-3257-SAG** 2:5 .
**21201** 1:50 .
**23** 28:20 .
**2405295** 15:13 .
.
.
**< 3 >** .
**3** 1:7, 34:13, 63:23 .
**30** 50:18 .
**30(b)(6** 59:15, 71:6, 72:2,
    74:23 .
**31st** 78:17 .
**37** 50:5 .
**38** 50:8 .
**39** 50:8 .
.
.
**< 4 >** .
**45** 3:25, 20:18, 21:3, 22:15 .
**4th** 1:49 .
.
.
**< 5 >** .
**5** 53:10, 56:4, 56:5 .
**50** 7:2 .
**502** 9:23, 9:24 .
**524(g** 8:24, 9:2, 9:4, 9:6, 10:1,
    10:11, 27:22, 27:23,

    34:20 .
.
.
**< 6 >** .
**6** 56:4, 57:7 .
**60** 41:6, 42:11, 42:24,
    50:14 .
.
.
**< 7 >** .
**7** 56:4, 58:18 .
**70** 27:22 .
**75** 9:8, 15:2, 15:7 .
**7C** 1:22 .
.
.
**< 8 >** .
**8** 65:25 .
**80** 35:6 .
.
.
**< A >** .
**a.m.** 2:2, 68:24 .
**abandoned** 22:17 .
**abide** 24:19 .
**able** 22:6, 23:24, 24:11, 34:4,
    39:6, 59:25, 78:2 .
**above** 59:10 .
**above-entitled** 78:14 .
**Absolutely** 5:13, 14:2, 27:10,
    41:19 .
**abundance** 64:6 .
**abuse** 46:20 .
**abuses** 22:23 .
**abusive** 44:11 .
**ACC** 19:1, 21:20, 21:24, 23:1,
    51:24 .
**accept** 36:5 .
**accepted** 9:8 .
**access** 37:3, 37:4, 37:5, 37:12,
    37:16, 37:20, 42:15,
    54:8 .
**accompanying** 52:23 .
**Accordingly** 15:22, 17:7 .
**account** 52:1 .
**accusation** 40:24 .
**acknowledge** 71:17 .
**acquisition** 7:5, 7:10 .
**acronym** 30:1 .
**acting** 36:20 .

action 19:14 .
actually 6:21, 14:18, 29:8 .
Adam 1:36, 2:24 .
add 11:2 .
added 57:8 .
additional 75:13 .
Additionally 42:7 .
address 3:15, 4:3, 5:6, 5:12,
    11:17, 17:14, 20:8,
    23:21 .
addressed 18:12, 22:13,
    77:20 .
addresses 70:13 .
adjourned 78:8 .
admission 63:5 .
admissions 47:1 .
admit 70:2 .
adopt 23:2, 27:20 .
advance 22:7, 36:21 .
advantage 15:11, 56:25 .
affected 70:10, 70:17 .
affecting 52:9 .
affidavit 47:4, 48:8, 48:12,
    70:12 .
affidavits 39:25, 45:18, 46:6,
    46:14, 48:5, 50:16 .
affirms 47:7 .
agency 35:23 .
ago 10:6, 10:20, 30:21, 59:21,
    70:21, 73:18 .
agree 16:25, 17:14, 29:7,
    74:15 .
agreed 8:17 .
agreement 8:12, 8:19, 40:18,
    67:10 .
allege 70:24, 70:25 .
alleged 45:10, 45:12, 45:24,
    47:13, 47:17 .
alleges 22:2 .
allow 10:17, 22:6, 52:1, 57:20,
    70:6 .
allows 9:24 .
almost 10:6, 27:22, 42:12,
    73:2 .
already 15:4, 33:22, 40:1, 45:4,
    45:5, 56:15, 56:23, 62:13,
    63:8, 64:16, 66:3, 70:1, 70:2,
    70:4, 73:17 .
alternate 44:14 .
alternative 42:10, 44:14 .

Although 15:19, 22:16, 27:6,
    51:10, 60:8, 64:1 .
amended 47:25 .
among 28:21, 52:15 .
amount 31:2, 60:15 .
amounts 53:12 .
analysis 15:23, 16:5, 23:14,
    76:4 .
analytical 14:23 .
analyzed 23:16 .
and/or 77:17 .
anonymize 29:18 .
anonymized 12:6 .
answer 5:15, 6:15, 11:3, 16:10,
    17:17, 20:2, 28:14, 28:15,
    38:19, 59:25, 63:19,
    72:11 .
answered 46:15 .
answering 18:20 .
answers 3:19, 17:11, 47:25,
    48:9, 68:10, 70:14 .
anticipate 30:20 .
anticipating 59:23, 63:15,
    64:2 .
anybody 28:8, 37:12, 39:16,
    39:21, 64:3 .
Anyway 6:18, 11:25, 24:15 .
apart 53:23 .
apologize 26:14 .
appealed 10:18, 12:7 .
appeals 10:20 .
appearing 46:3, 49:7,
    50:10 .
applicable 3:23, 18:10,
    76:6 .
application 16:7, 16:12 .
applied 15:18, 16:15 .
applies 8:24, 9:1, 17:25, 18:8,
    20:22 .
apply 6:5, 13:10, 17:8, 18:1,
    18:6, 18:9, 18:19, 19:7,
    19:15, 37:13, 37:16, 38:4,
    38:5, 38:21, 69:20 .
applying 26:20 .
appreciate 13:10, 20:11, 29:22,
    73:15, 74:9 .
approach 23:9, 23:10, 23:12,
    27:20, 27:25, 43:15 .
appropriate 11:16, 22:8, 23:12,
    24:7, 40:14, 75:5, 76:25 .

Appropriately 22:16 .
appropriateness 24:24 .
approve 15:3, 34:17 .
approved 52:9 .
approving 11:7 .
Architects 16:14 .
are. 29:20 .
areas 3:12 .
argue 6:4 .
argued 3:24, 11:13, 51:3 .
argues 49:8 .
arguing 4:10 .
argument 4:14, 4:17, 4:20, 4:22,
    6:22, 10:19, 19:4, 22:16,
    26:25, 31:3, 33:19, 46:21,
    53:2, 75:18 .
arguments 22:7, 23:25,
    54:4 .
arising 16:18 .
arose 19:3, 54:15 .
around 41:5, 43:17, 75:14 .
arrangement 67:10 .
article 62:10, 62:12, 62:14,
    63:2, 70:20, 70:23, 70:25,
    71:9, 71:13 .
asbestos-containing 7:7, 47:2,
    49:9, 52:17, 53:15 .
asbestos. 63:24 .
assert 51:5, 56:16, 68:1 .
asserted 43:4, 51:12 .
assertion 19:20, 57:24,
    63:1 .
assertions 27:25 .
asserts 41:3 .
assets 7:18, 7:23, 8:6, 8:7,
    8:15 .
assigned 7:24, 51:15 .
assist 6:21, 21:23 .
assume 71:1 .
assuming 17:25, 42:17,
    71:11 .
attached 46:24 .
attaches 34:24 .
attention 74:7 .
attorney 18:10, 19:13, 27:4,
    34:23, 34:25, 35:12, 39:9,
    39:12, 52:13, 59:5, 59:9,
    61:13, 61:18, 61:19, 61:24,
    62:19, 67:17 .
attorney- 15:21 .

**attorney-client** 19:7, 19:18, 19:21, 35:9 .
**Attorneys** 15:20, 15:24, 35:2, 41:21, 62:24, 73:17, 73:25 .
**attributable** 44:20, 45:11, 45:20 .
**authority** 4:24, 38:6, 38:17 .
**authorized** 7:15, 25:19 .
**available** 56:15, 56:20 .
**avenue** 29:4 .
**avoid** 66:14 .
**aware** 5:21, 22:24, 28:12, 28:13 .
**AWI** 49:22 .

.

.

**< B >** .
**Babcock** 1:28, 46:10 .
**baby** 33:8 .
**Back** 16:8, 17:21, 22:9, 23:22, 25:18, 26:9, 28:7, 29:23, 60:5, 66:15, 68:20 .
**background** 6:11, 6:20, 10:4, 11:20, 13:11, 17:15, 20:6 .
**Bailey** 1:28 .
**ballot** 9:10, 9:11, 34:15, 34:16, 34:18, 34:19, 35:15, 48:17, 48:18, 51:25, 52:13, 52:19 .
**ballots** 19:22, 43:13, 51:23, 52:22, 55:2, 59:10, 64:16, 75:8, 76:16 .
**Baltimore** 1:15, 1:50, 2:15, 44:16, 50:9, 50:11, 50:13 .
**bankruptcies** 10:12, 27:22, 30:12 .
**bar** 2:15, 76:7 .
**based** 22:1, 23:2, 46:18 .
**basically** 55:20 .
**basis** 21:18, 22:3, 35:16, 43:8, 56:16, 56:23, 65:2, 67:11, 73:4 .
**Bates** 21:21, 21:22 .
**bearing** 24:22 .
**became** 8:12 .
**began** 47:7, 47:12, 47:15 .
**Behalf** 1:25, 1:33, 47:24,

52:10 .
**behind** 13:19 .
**belied** 53:8, 54:5 .
**belief** 52:15 .
**believe** 10:21, 17:8, 31:3, 34:13, 54:14, 55:11, 75:24, 76:5, 77:3 .
**believes** 74:10 .
**believing** 35:16 .
**bench** 3:18 .
**benefit** 45:7, 45:8 .
**beside** 48:2 .
**best** 41:12, 52:14, 53:17 .
**better** 58:9 .
**Beyer** 6:13, 9:22, 11:6, 27:18, 28:2, 28:6, 69:6 .
**beyond** 61:11 .
**big** 13:4, 32:9, 41:10 .
**billion** 23:1 .
**billion-dollar** 51:1 .
**bit** 12:10, 56:8, 60:9, 62:11 .
**Blair** 52:12 .
**boils** 70:3 .
**boosted** 4:8 .
**bottom** 47:8 .
**box** 70:6 .
**Bradshaw** 1:40, 2:22 .
**break** 68:17, 72:19 .
**brief** 16:14, 19:5, 49:16, 49:17, 49:19, 51:24, 52:3, 54:7, 54:19, 63:11 .
**briefing** 3:10, 11:20, 15:13, 26:25, 62:11 .
**briefs** 19:3, 22:25, 63:9 .
**bring** 27:21, 74:7 .
**Brittingham** 52:12 .
**broad** 25:22, 58:18 .
**broader** 60:9, 64:21, 73:12 .
**broadly** 17:18, 54:20 .
**Buffalo** 49:6 .
**burden** 21:15, 43:9, 44:1, 58:20, 60:5, 66:15, 69:23, 71:10 .
**burdensome** 26:6, 26:7, 54:21 .
**burdensomeness** 74:20 .
**Business** 7:15, 8:14, 37:10, 52:8 .

.

.

**< C >** .
**cabin** 57:21 .
**California** 15:14, 16:2 .
**call** 4:16, 8:16, 10:8, 25:8, 72:15, 75:6 .
**called** 7:5, 7:12, 11:9, 28:18, 34:18, 58:1, 67:13 .
**calling** 67:15 .
**Canada** 47:15 .
**cap** 47:18 .
**caption** 13:20, 16:24, 16:25 .
**Carbide** 44:12, 44:20, 45:5, 45:11, 45:25, 46:25, 48:15, 65:7, 65:8, 70:15 .
**care** 4:18 .
**Carey** 47:15 .
**Carolina** 1:10, 2:12, 2:22, 6:13, 6:25, 7:1, 7:23, 8:12, 9:12, 9:14, 11:7, 12:11, 20:7, 20:13, 21:6, 21:9, 23:7, 23:20, 23:23, 24:10, 24:17, 25:2, 25:5, 26:12, 26:15, 26:18, 27:2, 27:9, 40:17, 40:22 .
**carried** 24:7 .
**catchall** 58:18, 58:19, 58:20, 63:25, 64:6, 64:13 .
**categorical** 51:17 .
**categories** 4:25, 24:2, 51:15, 75:6 .
**category** 51:23, 53:5, 57:12 .
**caught** 26:3 .
**caused** 8:25, 14:14, 53:12 .
**caution** 64:7 .
**ceased** 7:21 .
**Celotex** 46:7, 46:9, 47:14 .
**Central** 15:14, 16:8 .
**centralized** 32:4 .
**certain** 7:6, 7:23, 7:24, 14:8, 32:2, 35:17, 38:8, 48:18 .
**Certainly** 3:15, 39:18, 42:12, 59:18, 65:9, 71:23, 73:7, 75:13, 75:15, 77:14 .
**certified** 46:5, 52:13 .
**certify** 78:12 .
**cetera** 49:25, 52:25, 53:14, 57:11, 59:10 .
**chance** 24:16 .

change 70:10, 70:11 .
changed 73:16 .
changing 47:19 .
characterization 29:8,
    74:12 .
characterize 38:20 .
Charles 1:35, 2:19 .
Charlotte 2:22, 6:13, 6:25 .
Circuit 5:18, 10:20, 10:22, 18:1,
    19:16, 26:16, 29:3, 29:5,
    44:16, 50:8 .
circumstance 71:25 .
circumstances 6:6, 17:9,
    18:22 .
citations 49:18, 52:3 .
cite 16:13, 19:15, 56:18 .
cited 15:13, 16:14, 18:13 .
cites 49:15, 51:24, 54:6 .
City 44:16, 50:9, 50:14 .
Civil 1:8, 2:5, 3:25, 20:20 .
claimant 30:10, 30:12, 30:14,
    31:24, 32:14, 33:1, 33:13,
    34:1, 34:4, 34:19, 35:15,
    35:18, 35:19, 43:1, 49:23,
    52:8, 53:24, 54:2, 65:14 .
Claimants 9:8, 10:14, 10:18,
    13:14, 14:5, 15:2, 15:7, 17:1,
    17:3, 18:19, 19:1, 19:2,
    25:13, 26:2, 29:19, 34:16,
    35:6, 36:20, 51:4, 51:6, 52:5,
    52:11, 52:16 .
claiming 45:19 .
clarification 71:4, 76:15 .
clarifications 77:3 .
clarified 77:16 .
clarify 12:9, 77:16 .
clarifying 10:19, 74:8 .
clear 54:7, 58:16, 64:8,
    77:13 .
CLERK 2:4, 2:18, 28:3, 28:4,
    38:8, 38:12, 40:22, 68:22,
    69:7, 78:7 .
Client 14:12, 14:15, 15:22,
    25:12, 35:10, 35:11, 38:1,
    38:2, 57:25, 58:11, 61:21,
    62:1, 62:4, 68:8, 68:18, 69:3,
    72:14, 73:1, 73:5, 73:11 .
client-identifying 73:5 .
clients 34:22, 34:24, 63:14,
    76:2 .

closed 16:11, 16:12 .
co-counsel 65:1, 65:24,
    67:9 .
Code 7:16, 8:15, 8:24, 9:6, 9:24,
    31:12, 36:17 .
Coincidentally 9:19 .
comes 2:6, 14:12, 14:19 .
comfortable 5:13 .
coming 25:12 .
comment 67:13 .
Committee 19:1, 33:9, 36:18,
    49:16 .
common 36:21 .
communicate 19:9 .
communication 57:5,
    58:10 .
communications 59:17, 61:25,
    67:16, 68:8 .
companies 7:17, 7:18, 7:19,
    7:20 .
Company 7:2, 7:5, 7:6, 7:17,
    7:20, 8:7, 32:23, 33:21,
    33:25, 54:3 .
compare 70:4 .
comparison 44:2 .
compel 50:2 .
compensating 33:22 .
competitive 37:8 .
complaint 45:10, 45:24,
    47:17 .
complete 56:11, 56:24 .
completely 24:25 .
complying 44:1 .
compound 7:7, 45:12 .
comprehensive 32:16 .
compromising 25:20 .
computer 1:44 .
concealed 68:4 .
concede 13:23 .
conceivable 58:24 .
concept 69:10 .
concern 58:8, 59:19, 60:23,
    64:1, 66:10 .
concerned 25:20, 43:7 .
concerning 43:19, 47:4,
    63:24 .
concerns 18:12, 20:4 .
concert 36:20 .
concessions 69:15, 69:16 .
conclude 21:13 .

concluded 5:5, 18:3, 78:9 .
conduct 3:11, 24:11, 26:19,
    37:10, 44:15, 60:6 .
conducted 20:12, 24:1,
    25:15 .
confer 77:25 .
conferred. 62:24 .
confidential 51:19 .
confirmation 9:5 .
confirmed 9:7, 15:1, 48:9,
    50:13 .
conform 47:25 .
Congress 27:23 .
connect 10:5 .
connection 18:21, 50:17 .
Connolly 10:16, 12:3, 12:16,
    27:18, 29:16 .
consequences 39:22 .
considerable 8:7 .
consist 11:11 .
consistent 12:2 .
consists 36:18 .
constitute 46:22 .
constitutes 20:16, 75:24 .
consult 68:18 .
contain 44:25, 47:1, 48:21, 49:8,
    49:10, 50:23, 59:6,
    60:14 .
contained 44:22, 44:23, 48:11,
    66:22 .
containing 55:22 .
contains 33:12, 41:6, 48:20,
    49:20, 52:3, 52:20 .
contested 4:1, 20:16, 20:19,
    20:21 .
context 6:11, 6:14, 19:6, 44:8,
    50:20, 51:14, 66:8, 71:8 .
contingent 31:13 .
continue 16:10, 20:3, 67:25 .
continued 7:9, 66:6 .
continues 3:20, 14:18, 65:4 .
contradiction 7:13 .
control 61:11, 66:21 .
convenience 77:9 .
conversation 72:18 .
convinced 21:25 .
copy 39:12, 73:23 .
corporate 7:11 .
corrected 47:23, 48:9,
    48:10 .

**correction** 70:13 .
**corrections** 48:10, 48:13 .
**correctly** 25:4, 74:16 .
**correspondence** 60:19 .
**costs** 8:17 .
**counsel.** 15:24 .
**countenanced** 27:25 .
**counter** 17:14 .
**counterargument** 4:3, 4:4 .
**country** 41:5, 43:17 .
**couple** 15:4, 73:16 .
**course** 4:12, 5:18, 16:1, 33:15, 37:17, 46:13 .
**Courtroom** 1:22, 24:22 .
**Courts** 5:19, 10:22, 22:21, 23:16, 40:18, 42:16, 49:4, 50:1, 50:2, 50:3, 50:6, 50:8, 52:5, 54:5, 54:9, 69:25 .
**cover** 58:13 .
**Cpfs** 32:3, 32:7 .
**create** 75:15 .
**created** 8:23, 9:2, 9:4, 10:11, 16:21, 27:23, 30:12 .
**creates** 25:22, 34:20 .
**credible** 49:13, 49:21, 49:24, 50:24 .
**creditor** 16:25, 30:24 .
**creditors** 13:15, 17:3, 17:4, 18:16, 18:17, 36:19, 53:11 .
**critical** 26:20, 40:18, 56:10, 60:21 .
**CRR** 1:47, 78:12 .
**crucial** 6:4, 28:18 .
**cry** 18:21 .
**current** 9:8, 13:14, 13:25, 15:24, 17:4, 50:13, 67:2, 67:7 .
**currently** 9:17, 61:10, 66:21, 66:24 .
**custody** 61:10, 66:21 .

.

.

**< D >** .

**Dahlgren** 62:9, 63:2, 70:19, 70:20, 70:23, 70:25, 71:9, 71:13 .
**Dallas** 11:23 .
**damages** 23:3, 47:19, 53:12 .
**data** 10:13, 25:10, 29:10, 29:12,

33:14 .
**date** 50:14 .
**Dated** 78:17 .
**David** 1:30, 1:31, 2:14 .
**day** 26:17, 78:17 .
**days** 44:18, 50:14, 50:18, 72:5, 73:1 .
**DCPF** 10:8, 10:14, 12:2, 25:9, 30:3, 30:4, 31:21, 32:1, 32:5, 32:13, 35:23, 41:4, 41:5 .
**dead** 23:8, 41:3, 41:15 .
**death** 14:13, 47:5, 48:8 .
**debtor** 7:23, 8:11, 8:18, 9:3, 13:20, 21:13, 21:19, 21:22, 21:23, 22:1, 23:2, 23:14, 52:2, 52:7, 64:20, 64:23 .
**debtors** 21:14, 22:7, 53:13 .
**decades** 7:4, 28:13 .
**deceased** 73:18 .
**decide** 14:9, 20:25, 34:17, 36:4, 59:8 .
**decided** 9:12, 40:23, 56:18 .
**decides** 33:20 .
**decision** 20:15, 21:10, 23:13, 24:8, 35:10, 51:2, 54:6 .
**decision-making** 62:18 .
**decisions** 14:4, 16:21 .
**declaration** 47:22 .
**decline** 56:24 .
**declined** 12:15, 12:17 .
**defendant** 13:17, 53:25 .
**defendants** 2:18, 13:18, 48:4, 48:5, 64:20, 64:25, 66:6, 70:15 .
**defense** 58:9 .
**defer** 59:7 .
**define** 72:23 .
**defined** 75:3 .
**defines** 31:12 .
**Definitely** 19:24, 39:20, 64:21 .
**definition** 62:1 .
**Delaware** 10:7, 10:8, 10:12, 10:15, 12:3, 12:16, 23:21, 24:6, 25:6, 25:18, 26:5, 26:9, 26:11, 26:15, 27:7, 29:9, 30:2, 32:2, 32:3, 32:10, 40:10, 40:16, 41:11 .
**demanding** 67:18 .
**demonstrate** 49:23 .

**denied** 11:25, 12:1, 12:11, 45:23 .
**denying** 77:17 .
**departed** 48:6 .
**depending** 49:2 .
**deponent** 60:2, 61:15 .
**depose** 5:20, 43:18, 43:20, 45:6 .
**deposed** 18:10, 45:21, 45:25, 46:12 .
**deposing** 6:4 .
**deposition** 18:11, 18:22, 45:23, 46:2, 46:5, 46:16, 47:5, 48:6, 48:7, 62:17, 63:5, 72:5, 77:25 .
**depositions** 18:8, 25:15 .
**deprive** 24:9 .
**derived** 7:4 .
**describe** 54:20 .
**described** 29:10 .
**Desert** 16:13, 16:14, 17:7, 18:13, 18:23, 69:21 .
**designed** 32:21, 58:19, 58:20 .
**desk** 38:9 .
**detail** 18:7 .
**determination** 3:17, 3:20, 21:17, 36:2 .
**determinations** 20:23 .
**determine** 9:25, 33:16, 35:20, 42:18 .
**determined** 9:22, 11:15 .
**determines** 33:24 .
**developing** 21:23 .
**died** 46:2 .
**different** 11:21, 13:19, 18:17, 25:8, 27:4, 29:12, 33:7, 35:14, 37:17, 48:19, 49:1, 57:15 .
**differently** 12:5 .
**differs** 29:9 .
**digging** 61:18 .
**directed** 4:23, 6:10 .
**directly** 6:15, 11:3, 15:25, 43:16 .
**disagreed** 27:18, 40:16 .
**disclose** 22:2, 23:5, 23:6, 44:13, 48:3, 50:3, 57:17, 76:24 .
**disclosed** 43:5, 44:19, 45:2, 45:3, 45:5, 45:17, 45:22,

46:19, 47:5, 48:12, 50:25,
54:1, 56:6, 60:12, 66:7 .
**discloses** 67:23 .
**disclosure** 50:6, 50:12, 53:3,
57:7, 58:7, 76:1, 76:7 .
**Disclosures** 43:25, 59:11, 64:18,
64:19, 64:23 .
**discover** 16:20 .
**discoverable** 49:6, 50:19,
53:4 .
**discrete** 23:18 .
**discretion** 77:10 .
**discussed** 77:7 .
**discussions** 62:6 .
**disfavored.** 15:16 .
**dismissed** 15:9 .
**dispute** 74:12 .
**disputing** 44:24 .
**disregard** 39:21 .
**distinction** 38:25, 39:3,
51:17 .
**distinguish** 15:23 .
**distinguishable** 18:14 .
**distributed** 52:18 .
**distributing** 53:13 .
**distribution** 21:23 .
**District** 1:1, 1:2, 1:9, 7:1, 10:15,
11:6, 15:14, 16:2, 23:20,
25:6, 26:5 .
**divide** 7:13, 7:18 .
**DIVISION** 1:3 .
**divisional** 7:12, 8:2, 8:14 .
**Docket** 2:5, 42:16 .
**doctrine** 5:18, 19:21 .
**document** 18:9, 34:10, 34:12,
38:16, 39:6, 39:10, 49:15,
51:10, 55:8, 55:21, 58:14,
59:13, 60:4, 60:11, 60:25,
63:19, 64:2, 71:19, 71:23,
75:10 .
**documentation** 29:13, 30:5,
38:8 .
**documents** 5:4, 19:20, 24:3,
25:11, 42:6, 43:16, 43:19,
44:8, 51:11, 51:24, 53:5,
55:5, 55:19, 56:5, 56:12,
56:21, 58:5, 59:4, 60:3,
60:12, 60:14, 60:24, 61:1,
63:25, 64:12, 72:4, 72:8,
73:4, 73:10, 75:6 .

**doing** 17:22, 50:11, 63:16 .
**dollars** 13:4 .
**done** 9:21, 29:24, 36:14, 37:19,
43:10, 43:11 .
**door** 60:5 .
**down** 5:8, 20:3, 29:1, 61:8,
68:15, 70:3 .
**downplay** 46:20 .
**downstairs** 38:12 .
**draft** 77:10 .
**draw** 38:25 .
**dryers** 33:5 .
**drywall** 7:8 .
**duces** 10:7 .
**due** 53:12 .
**during** 50:17, 69:7, 74:18 .
.
.
**< E >.**
**E.** 1:30, 1:31 .
**eager** 22:6 .
**Eagle-picher** 46:9, 47:8 .
**earlier** 31:19, 67:13, 67:14 .
**easily** 66:17 .
**economy** 44:2, 54:11 .
**effect** 50:13, 58:2 .
**efficient** 3:10 .
**efforts** 55:9, 61:19 .
**eight** 22:2 .
**Eighth** 5:18 .
**Either** 18:5, 53:11, 71:18,
73:23 .
**Either/or** 54:9 .
**elected** 54:10 .
**electronic** 73:12, 73:23 .
**electronically** 73:2, 73:9 .
**elements** 5:20, 6:2 .
**eliminated** 74:24 .
**email** 57:4, 73:16 .
**emails** 61:18 .
**embraced** 69:10 .
**emphasized** 40:9 .
**employed** 29:12, 67:2 .
**employees** 67:6 .
**encroach** 58:15 .
**encroaches** 64:9 .
**end** 3:13, 12:10, 26:17 .
**ended** 47:7, 47:16 .
**Energy** 15:12 .
**engage** 59:1 .

**enormous** 23:19 .
**ensure** 23:23, 52:2, 56:24,
58:3 .
**ensures** 56:13 .
**ensuring** 56:10 .
**entertaining** 20:25 .
**entire** 12:21 .
**entirely** 32:15 .
**entities** 8:1, 22:14 .
**entitled** 36:3 .
**entitlement** 33:16 .
**entity** 30:2, 50:16 .
**envision** 60:5 .
**envisioning** 57:10 .
**erroneous** 47:23 .
**errors** 70:13 .
**ESI** 55:6, 59:24, 73:7 .
**especially** 70:1 .
**Esquire** 1:27, 1:30, 1:35, 1:36,
1:39 .
**essentially** 55:23, 72:8 .
**established** 15:21 .
**establishes** 44:10, 44:25,
47:12 .
**estate** 46:17, 52:3 .
**estimate** 9:13, 9:14, 9:24, 21:10,
23:15, 35:19 .
**estimated** 17:6 .
**estimating** 21:19 .
**estimation.** 23:17 .
**et** 49:25, 52:25, 53:14, 57:11,
59:10 .
**ethical** 58:1 .
**evaluating** 21:24 .
**evaluation** 24:11 .
**eve** 45:15, 45:17, 48:15 .
**everybody** 40:18, 56:11 .
**everyone** 3:4 .
**everything** 8:7, 70:4 .
**evidentiary** 34:10, 35:18, 63:6,
63:13 .
**Exactly** 28:3, 30:9, 37:24, 44:14,
47:19, 62:11 .
**exam** 21:13 .
**examination** 20:18, 20:22, 21:1,
21:12, 59:15 .
**example** 31:14, 31:15, 35:5,
36:14, 36:23, 36:24, 38:8,
42:10, 57:18, 61:7, 61:13,
73:4 .

**Excel** 25:10 .
**except** 77:17 .
**exception** 59:9 .
**excerpt** 20:14, 49:20 .
**exclusive** 23:15 .
**exclusively** 73:2 .
**Excuse** 76:11 .
**executed** 46:5 .
**exhaustive** 60:6 .
**Exhibit** 31:17, 31:18, 34:12,
    34:13, 48:25, 49:18, 52:16,
    52:23 .
**exhibits** 9:10, 30:13, 30:15,
    39:24, 42:16 .
**exist** 7:21 .
**exists** 39:7, 39:10 .
**expect** 60:17, 64:11 .
**expected** 60:3, 61:20 .
**expecting** 60:23, 64:12 .
**expenses** 8:17 .
**experience** 41:1, 60:18 .
**expert** 21:21, 71:6, 71:7 .
**explain** 11:4, 30:13, 45:6, 48:8,
    48:13 .
**explained** 8:21 .
**explains** 13:7 .
**explanation** 16:6 .
**explicitly** 22:22 .
**exposed** 14:15, 14:17, 45:19,
    47:10, 49:12, 52:16,
    52:24 .
**exposures** 33:3, 44:14, 44:21,
    45:3, 45:13, 47:2, 47:4, 47:9,
    49:9, 56:7, 59:6, 60:13,
    63:24, 65:8, 68:2 .
**extending** 4:24, 5:16 .
**extends** 73:10 .
**extension** 5:1, 5:17 .
**extensive** 3:10, 55:6, 59:24 .
**extent** 54:22, 65:4, 67:15,
    77:17 .
**extrapolating** 23:4 .
**extremely** 76:4 .
    .

**< F >** .
**fabricated** 52:18 .
**face** 18:6, 42:13, 52:4 .
**Facility** 10:8, 10:9 .
**fact** 14:11, 18:15, 23:16, 40:25,

    48:3, 57:23, 63:6 .
**factor** 69:21 .
**factors** 16:7 .
**facts** 15:17 .
**failed** 15:5, 44:13, 48:3 .
**fails** 15:8 .
**failure** 22:2, 50:3 .
**fairly** 32:15, 32:16, 77:13 .
**faith** 22:3, 35:16, 44:10 .
**fall** 57:11, 60:10 .
**false** 46:22, 49:10, 52:4 .
**familiar** 60:3 .
**Far** 18:21, 26:21, 59:4 .
**fashion** 66:13 .
**favor** 15:8, 34:20, 34:21 .
**favors** 44:2 .
**FCR** 19:2, 21:20, 21:25,
    23:1 .
**Federal** 1:48, 3:25, 20:20,
    22:21, 30:23, 40:21,
    49:4 .
**feel** 35:13 .
**fees** 19:13 .
**ferret** 63:17 .
**few** 8:4, 8:9, 70:8, 73:3 .
**field** 32:10 .
**figure** 61:20 .
**filed** 6:24, 8:5, 8:10, 10:14, 28:5,
    31:21, 33:19, 35:22, 35:25,
    38:2, 40:1, 42:16, 44:18,
    46:8, 49:16, 49:19, 63:9,
    63:11, 71:19, 71:23 .
**files** 14:22, 15:11, 16:3, 16:4,
    25:12, 30:14, 30:24, 34:19,
    54:23, 55:1, 55:12, 55:14,
    58:4, 61:19, 66:8, 66:12,
    66:23, 67:22, 72:15, 72:20,
    72:24, 72:25, 73:1, 73:8,
    73:11, 73:18, 73:22 .
**filings** 46:11, 53:9 .
**fill** 34:22, 46:14 .
**fills** 34:23 .
**finally** 72:17 .
**find** 28:8, 28:15, 42:23, 60:5,
    74:19, 75:5 .
**Findings** 50:25 .
**finds** 75:9 .
**fine** 6:17, 6:20, 17:11, 39:17,
    58:16, 64:23, 76:13,
    76:20 .

**firms** 11:22, 23:5, 27:21, 28:21,
    36:19, 37:7, 37:8, 43:3,
    54:12, 57:19, 68:1,
    73:19 .
**First** 4:11, 5:25, 6:1, 11:22,
    17:16, 22:21, 27:20, 30:22,
    31:11, 46:20, 69:5, 69:21,
    70:23 .
**five** 43:17, 44:17 .
**fix** 31:13, 48:13 .
**flat** 19:22 .
**Floor** 1:49 .
**focus** 44:1 .
**focusing** 60:22 .
**folks** 30:22 .
**follow** 20:20, 48:21 .
**following** 7:10 .
**follows** 72:16 .
**footnotes** 50:5, 50:7 .
**forced** 45:6 .
**foregoing** 78:13 .
**form** 7:17, 25:10, 30:23, 30:24,
    30:25, 31:15, 31:19, 31:25,
    33:17, 36:8, 43:13, 49:1,
    53:3, 55:2, 73:12, 73:24,
    75:6 .
**format** 34:23 .
**formation** 7:16 .
**formed** 7:22, 8:4, 8:14 .
**Former** 7:19, 16:15, 16:17 .
**formulating** 16:16 .
**forth** 24:8 .
**Fortune** 7:2 .
**forums** 43:18 .
**found** 28:11, 40:13, 44:15, 50:3,
    50:22 .
**foundational** 66:20 .
**four** 51:15, 51:21, 55:21 .
**Fourth** 17:25, 19:16, 36:13 .
**frame** 17:18, 47:19 .
**fraud** 27:17, 27:20, 27:25, 28:6,
    28:11, 69:10 .
**front** 6:8, 13:2, 13:6, 13:18,
    26:9 .
**Full** 62:2 .
**fully** 3:5, 50:22 .
**fundamental** 51:1 .
**funding** 8:12, 8:19, 8:22 .
**Future** 19:1 .
    .

**< G >** .

**G.** 1:36, 1:47, 78:12, 78:22 .

**Garlock** 22:19, 22:20, 22:24, 23:8, 23:9, 24:12, 27:19, 28:5, 36:23, 37:2, 37:3, 37:22, 37:24, 40:23, 44:15, 47:20, 50:22, 51:1, 52:10, 52:19, 53:2, 54:11, 57:23, 69:7, 69:8 .

**gaskets** 52:17, 52:24 .

**general** 4:18, 4:19, 16:15, 16:17, 17:14 .

**generally** 3:22, 20:17 .

**Georgia-pacific** 7:2, 7:3, 7:9, 7:11, 7:21, 7:22, 7:24, 8:13, 8:16, 8:20, 8:22, 45:12 .

**germane** 65:9 .

**gets** 41:4, 65:3 .

**getting** 19:24, 26:10, 26:13, 31:19, 34:3, 41:3, 62:19 .

**give** 6:10, 6:14, 6:20, 13:11, 14:22, 15:11, 17:13, 20:5, 24:15, 25:11, 36:13, 36:24, 37:15, 38:3, 38:16, 43:12, 65:17, 72:4 .

**given** 32:23, 36:23 .

**gives** 31:1 .

**Giving** 15:10, 39:5, 39:12 .

**gladly** 77:25 .

**gosh** 70:20 .

**gotten** 5:9 .

**GP** 45:4, 45:14, 46:1, 48:12, 48:13, 48:14 .

**grant** 12:6, 21:13 .

**Granting** 24:9 .

**Greenberg** 1:37, 2:20, 2:25 .

**grossly** 40:17 .

**group** 9:25, 27:3, 36:18, 61:1 .

**GST** 52:25 .

**guess** 14:7, 26:24, 27:5, 32:18, 39:10, 57:11, 58:8, 59:19, 64:1, 66:10 .

**guessing** 10:22 .

**Gypsum** 7:5, 7:6, 7:10, 46:7, 46:10 .

**< H >** .

**hair** 33:5 .

**half** 29:3 .

**hand** 38:13 .

**handing** 39:4 .

**handle** 26:11 .

**handled** 41:17, 48:24, 73:25 .

**happen** 22:10, 26:3, 35:8, 57:14 .

**happened** 61:9, 76:4 .

**happening** 24:23, 25:2, 25:14 .

**happens** 14:12, 29:5, 35:2, 35:8, 65:2, 65:13, 65:15 .

**Happy** 16:8, 17:18, 20:3, 20:9, 23:21, 28:15, 30:15, 69:15, 77:11, 77:16 .

**hard** 73:23 .

**hazard** 64:4 .

**headed** 69:18 .

**hear** 6:15, 20:9, 23:11 .

**heard** 6:11, 7:2, 9:16, 10:19, 11:22, 18:16, 30:21, 69:14, 69:15, 75:18 .

**HEARING** 1:20, 2:7, 3:11, 11:23, 23:7, 31:3 .

**hearings** 13:1 .

**heavily** 22:19 .

**held** 23:14, 49:5 .

**help** 35:2 .

**helpful** 55:17, 59:13, 63:22 .

**helps** 11:3 .

**hereby** 78:12 .

**herring** 24:21, 28:16, 28:17, 48:22 .

**highlighted** 47:9, 52:22, 53:10 .

**Hinson** 1:40 .

**history** 7:4, 22:23, 23:4, 23:15, 27:23 .

**HK** 46:9 .

**Hodge** 28:2, 28:4 .

**Hodges** 23:8, 28:6, 37:3, 37:12, 38:18, 39:11, 39:16, 39:21, 41:16, 41:19, 57:23, 58:1, 69:6, 75:10 .

**Hold** 41:23, 53:11 .

**holding** 4:24 .

**Honorable** 1:21, 68:22, 78:7 .

**Hopefully** 69:17, 78:2 .

**Hoskins** 1:30, 1:31, 2:14 .

**hub** 43:3 .

**huge** 24:21 .

**Hypothetically** 71:24 .

**< I >** .

**idea** 20:19, 68:19 .

**identified** 42:22 .

**illustrate** 46:4 .

**illustrative** 44:6 .

**Immediately** 14:15 .

**impact** 75:25 .

**impacts** 47:18 .

**implicate** 19:17, 51:18 .

**implication** 40:24 .

**implied** 69:6, 69:11 .

**importance** 52:21 .

**important** 15:1, 32:10, 33:20, 44:9, 74:18 .

**impose** 61:15, 66:15, 66:24 .

**imposed** 42:3 .

**imposing** 60:5 .

**improper** 3:24, 40:25 .

**inappropriate** 41:2 .

**Inc.** 56:18 .

**inclined** 17:16 .

**include** 11:18, 58:7 .

**included** 20:1, 42:19 .

**includes** 61:22 .

**including** 7:24, 13:1, 33:14, 52:11, 64:6 .

**inconsistencies** 43:24 .

**inconsistent** 28:17 .

**incorporate** 58:24, 77:6 .

**incorrect** 19:10, 54:5, 57:22 .

**incorrectly** 46:15 .

**increase** 58:20 .

**indemnification** 19:14 .

**independent** 63:16 .

**independently** 18:6, 53:24 .

**indicated** 10:16 .

**indisputedly** 16:21, 17:2 .

**individual** 29:19, 42:11, 55:13 .

**individually** 55:12 .

**indulge** 5:24 .

**indulgence** 61:2, 68:17 .

**inflated** 23:4 .
**influence** 24:22 .
**informative** 24:23 .
**informed** 62:25 .
**inherently** 40:12 .
**injured** 52:23 .
**injury** 53:12 .
**inquiries** 75:20 .
**inquiry** 74:21, 75:2, 75:24 .
**insight** 14:22, 21:8 .
**installing** 53:14 .
**Instead** 12:7, 23:1, 67:25 .
**instinct** 17:16 .
**institutional** 61:11, 66:22 .
**intend** 55:8, 75:15 .
**intending** 54:22 .
**intent** 71:3 .
**intents** 77:5 .
**interest** 13:15, 13:21, 14:1, 17:2, 36:21 .
**interested** 51:5, 51:6, 66:7, 67:17 .
**interesting** 14:11 .
**interpret** 76:12 .
**interpretations** 58:24 .
**interrogatory** 47:25, 48:9, 70:13 .
**interview** 14:15 .
**introduce** 2:8, 71:15, 71:20 .
**introduced** 22:1, 71:13 .
**investigate** 14:9, 14:10, 14:16 .
**investigative** 14:23 .
**invited** 29:23 .
**involve** 24:4 .
**involved** 16:16, 26:10, 26:13, 61:7 .
**involvement** 16:18, 18:19 .
**involves** 7:16, 14:3, 16:21 .
**involving** 65:14 .
**issue** 3:7, 3:15, 4:6, 4:11, 4:18, 4:19, 6:18, 17:24, 21:5, 21:20, 22:15, 24:14, 26:15, 27:15, 28:10, 29:8, 50:21, 56:10, 56:14, 73:8, 76:5, 77:6, 77:24 .
**issued** 4:12, 5:3, 10:7, 10:13, 24:24 .
**issues** 3:23, 17:18, 25:18, 44:6, 54:15, 55:4, 69:14, 74:19,
74:24, 75:16, 77:15 .
**issuing** 4:21, 44:10 .
**it.** 69:23 .
**items** 59:9 .
**itself** 33:24, 49:18 .

.

.

**< J >.**
**Jersey** 33:11 .
**Johns** 27:23, 27:24 .
**Johnson** 33:8, 33:10, 33:11 .
**joint** 7:7, 45:11, 58:9, 67:9, 70:16, 74:13 .
**Jr** 1:35 .
**judges** 37:22, 37:23 .
**judicial** 38:16, 38:18, 44:2, 54:10 .
**July** 7:11, 8:4, 10:6 .
**juncture** 6:9 .
**June** 12:3 .
**jurisdiction** 70:17 .
**jurisdictions** 27:5, 37:18, 42:12 .

.

.

**< K >.**
**keep** 31:8, 54:16 .
**keeps** 66:11 .
**key** 73:4 .
**kind** 14:11, 39:19, 47:19, 58:9, 58:18, 60:6, 74:16 .
**knowing** 66:7 .
**knowledge** 52:14, 61:11, 63:3, 66:22 .
**known** 7:14, 32:25, 33:13, 61:6, 66:23, 67:2 .
**knows** 4:14, 70:16 .

.

.

**< L >.**
**lack** 58:9 .
**landscape** 20:10 .
**language** 53:9, 53:23 .
**large** 41:11, 41:12 .
**largely** 73:2 .
**larger** 20:10, 41:9 .
**Last** 11:5, 29:2, 36:13, 58:23, 64:18, 64:19, 69:13 .
**later** 8:9, 11:17, 39:4, 39:5, 50:14, 65:6 .

**latter** 54:10, 56:1 .
**lawsuit** 46:13, 50:17, 67:22 .
**lawyer** 5:1, 18:22, 39:4, 57:24, 58:10, 58:11, 61:7 .
**lawyers** 13:7, 57:15, 57:20, 66:23, 67:2, 67:6, 67:7 .
**lay** 35:3 .
**lead** 5:24, 22:16 .
**learn** 16:4 .
**least** 29:4, 34:4, 38:15, 46:8 .
**leave** 3:6 .
**led** 22:25, 26:4 .
**leeway** 17:13 .
**left** 49:7, 50:11, 61:14, 61:18 .
**legal** 14:4, 16:21, 22:20, 23:9, 32:10 .
**legality** 24:24 .
**less** 41:7 .
**letter** 57:4 .
**letting** 13:11 .
**liabilities** 7:18, 7:24, 8:6, 8:8, 8:21, 8:25 .
**liability** 7:25, 9:3, 9:13, 9:15, 21:19, 21:22, 23:10, 23:16, 32:19, 32:23, 33:23, 35:20, 70:12, 70:17, 70:18, 74:13 .
**life** 44:21 .
**Likewise** 42:14 .
**limit** 40:15, 54:23, 61:5 .
**limitation** 75:11 .
**limited** 18:20, 33:14, 41:16, 55:10, 57:22, 62:2, 66:8, 75:3, 75:23 .
**limiting** 54:25, 72:19, 76:18 .
**line** 19:6, 74:17 .
**liquidated** 31:13 .
**list** 24:15, 24:20, 25:3, 27:1, 27:5, 27:7, 27:9, 34:24, 59:15 .
**listed** 52:23, 59:9, 76:24 .
**lists** 32:24, 33:12 .
**litigated** 50:22 .
**litigating** 43:18 .
**Litigation** 5:2, 7:4, 13:17, 16:16, 18:11, 18:12, 20:24, 22:23, 23:19, 24:4, 42:5, 43:8,

46:19, 46:20, 50:1, 56:11,
57:1, 57:15, 59:2, 59:3,
60:17, 63:1, 63:7, 63:9,
65:15, 71:23, 72:15, 72:17,
73:22, 75:25 .
**litigator** 64:5 .
**little** 12:10, 22:9, 56:7, 60:9,
62:11 .
**live** 73:24 .
**LLC** 1:6, 1:31, 1:33, 2:6 .
**LLP** 1:37 .
**location** 33:15 .
**log** 59:3, 67:18, 75:2 .
**logical** 49:11, 52:7, 66:13 .
**logs** 58:22 .
**Lombard** 1:49 .
**long** 7:4 .
**longer** 15:20, 24:17 .
**Look** 12:5, 12:13, 12:25, 23:24,
25:21, 30:15, 32:21, 33:1,
33:2, 38:9, 38:14, 44:7, 57:4,
59:14, 67:7 .
**looked** 9:11, 64:24 .
**Looking** 12:21, 12:22, 14:22,
25:9, 43:25, 47:6, 51:20,
52:19, 55:20, 55:22, 55:23,
56:4, 56:24, 57:2, 58:22,
59:1, 59:3, 60:7, 60:21,
61:17, 62:3, 62:12, 64:3,
65:17, 67:1, 71:12 .
**looks** 34:23, 46:3, 50:10,
58:4 .
**lost** 12:9 .
**lot** 33:7, 36:19, 40:5, 69:14,
69:25 .
**love** 6:14, 30:17 .
**LTL** 33:9 .
.
.
**< M >** .
**ma'am** 10:24 .
**magistrate** 56:19 .
**maintain** 73:1 .
**maintained** 45:15, 66:13, 73:2,
73:9 .
**maintains** 32:24, 72:25 .
**majority** 8:15, 32:9 .
**manage** 32:2 .
**managed** 10:14 .
**management** 10:10 .

**managing** 25:6 .
**manufacture** 7:9 .
**manufactured** 7:6, 52:18,
52:25 .
**manufacturers** 45:20, 68:3 .
**manufacturing** 53:13 .
**Manville** 27:24, 46:9 .
**March** 15:14, 78:17 .
**March 29, 2022** 1:16 .
**marketed** 52:19 .
**marketing** 53:13 .
**Martin** 1:37, 2:20, 2:25 .
**Maryland** 1:2, 1:15, 1:50,
47:18, 70:16 .
**mask** 3:3, 3:5 .
**masked** 3:4 .
**masking** 3:2 .
**master** 34:18, 75:7, 76:16 .
**material** 22:3, 44:13, 48:11,
58:25 .
**materially** 48:6 .
**materials** 3:21 .
**matter** 2:4, 2:6, 4:1, 4:11, 18:11,
20:17, 22:20, 24:19, 26:2,
41:10, 44:5, 50:7, 77:20,
78:15 .
**matters** 23:10, 23:11, 59:15,
73:25, 76:3 .
**maximize** 57:25 .
**mean** 22:5, 37:12, 41:24, 43:20,
64:25, 65:12, 71:3 .
**Meaning** 11:12, 27:9, 73:22,
75:7 .
**meaningful** 49:13, 49:21, 49:23,
50:2, 50:21, 50:23,
50:24 .
**means** 6:1, 9:13, 18:6, 23:15,
25:25, 38:20, 42:8,
42:10 .
**measure** 24:18 .
**mechanical** 1:43 .
**meet** 77:25 .
**mentioning** 38:2 .
**merely** 53:7 .
**merge** 7:14 .
**merger** 7:12, 8:2, 8:14 .
**merits** 23:17, 34:6, 34:9 .
**mesothelioma** 11:8, 14:8, 14:13,
21:18, 33:3 .
**met** 19:19, 21:15 .

**methodology** 29:12 .
**Miami** 11:23 .
**million** 23:2 .
**mind** 6:22, 31:9, 67:13 .
**minimal** 44:2 .
**minor** 8:8 .
**minus** 8:21 .
**minute** 70:9 .
**misleading** 40:12, 40:17 .
**missed** 68:11 .
**misspoke** 26:14 .
**Mitchell** 1:47, 78:12, 78:22 .
**mitigate** 40:15 .
**modeled** 27:24 .
**modified** 77:18 .
**modify** 3:8, 77:17 .
**moment** 24:13, 30:21, 31:6,
44:4, 45:6, 55:1, 61:3,
62:22 .
**monetary** 53:12 .
**money** 34:5, 60:15 .
**Monster** 15:12, 15:20, 15:21,
69:20 .
**months** 8:5, 8:9 .
**Morgan** 56:18 .
**morning** 2:3, 2:10, 2:16, 2:19,
2:21, 2:24, 3:1 .
**motion** 3:7, 12:1, 12:11, 20:25,
21:12, 21:13, 23:21, 24:9,
46:25, 77:17 .
**MOTIONS** 1:20, 2:7, 3:23,
42:13 .
**move** 6:15 .
**moved** 11:5, 29:15, 73:19 .
**MR. CURLETT** 22:19, 27:13,
41:15, 53:23 .
**MR. WALDREP** 12:23, 33:7,
39:2, 39:8 .
**multiple** 13:17, 36:19, 36:20,
43:18, 46:17, 53:19, 58:6,
59:6, 65:8 .
.
.
**< N >** .
**N.** 1:35 .
**name** 2:10, 13:20 .
**names** 42:19, 76:17 .
**narrow** 74:21 .
**narrowed** 74:18, 75:23,
77:6 .

**narrower** 20:19 .
**narrowing** 76:3 .
**narrowly** 54:22 .
**nation** 27:23 .
**National** 46:7, 46:9 .
**nationally** 41:7 .
**nature** 21:4, 48:10, 55:7, 75:23 .
**necessarily** 3:15, 10:23, 60:9, 60:10, 61:1, 66:13 .
**necessary** 21:16, 73:8, 74:14 .
**need** 6:19, 17:21, 27:17, 32:18, 35:15, 51:9, 69:5, 75:14, 77:3 .
**needed** 36:7 .
**needs** 23:24, 24:11, 33:13, 37:16, 42:8, 43:18, 74:10, 77:16, 77:19 .
**negotiated** 15:3 .
**negotiation** 60:13, 60:18, 60:25 .
**negotiations** 15:4, 59:16, 59:21, 60:10, 61:7 .
**neither** 26:7, 70:10 .
**net** 26:3 .
**Netdoc** 73:5 .
**New** 7:17, 7:18, 7:19, 7:20, 7:22, 8:12, 8:13, 8:16, 8:19, 8:21, 14:19, 33:11 .
**Next** 4:19, 9:17, 9:18, 10:3, 24:15, 34:12, 43:17, 64:15 .
**No.** 1:7, 1:8, 4:10, 31:18, 46:15, 55:18, 55:19, 56:5, 57:7, 58:18, 65:25 .
**None** 24:3, 24:4, 45:22, 74:1, 74:2 .
**noneconomic** 47:18 .
**nonprivileged** 6:3, 43:12, 75:3 .
**noon** 68:20, 68:23 .
**Nor** 48:8, 48:12, 67:17, 70:10 .
**normal** 13:16 .
**normally** 48:23 .
**NORTHERN** 1:3 .
**not-protected** 43:12 .
**notable** 29:23 .
**note** 76:9 .

**noted** 23:13, 73:17 .
**nothing** 9:1, 13:23, 62:6, 67:23, 69:6, 69:11, 71:2, 74:6 .
**notices** 41:25 .
**Notwithstanding** 46:11 .
**Number** 2:5, 13:7, 26:8, 32:14, 32:16, 40:9, 40:15, 40:20, 41:5, 51:10, 62:9, 63:23, 67:22, 68:15 .
**numerous** 13:14, 47:1 .
.
.
**< O >** .
**oath** 45:19 .
**obligation** 56:17, 61:15, 66:25, 73:9 .
**obligations** 57:21 .
**obtain** 4:1, 42:8, 42:9, 54:5, 61:16, 63:5 .
**obtained** 19:19 .
**obtaining** 6:1, 41:21, 41:23, 58:5 .
**Obviously** 3:7, 4:2, 13:4, 15:4, 35:9, 36:17, 57:10, 75:18 .
**occupation** 33:14 .
**occupational** 47:14 .
**occurred** 19:13, 49:24, 72:19, 72:24 .
**October** 9:17, 9:18, 10:3, 11:5 .
**office** 38:8, 38:13, 73:3 .
**Offices** 1:31 .
**Official** 1:48, 30:23, 31:15, 78:23 .
**often** 72:16 .
**Oftentimes** 57:14 .
**Okay** 4:9, 7:20, 10:3, 10:21, 12:17, 13:8, 13:12, 14:16, 14:21, 15:12, 17:20, 22:18, 27:11, 31:10, 40:2, 42:2, 51:20, 53:22, 57:7, 60:8, 63:15, 67:1, 68:6, 72:7, 72:11, 74:5, 74:9, 74:15, 77:13, 78:2 .
**old** 7:24, 8:20, 9:20 .
**Once** 20:19, 22:14, 26:5, 33:19, 40:22 .
**ones** 32:9, 41:9, 42:25, 55:4 .

**ongoing** 60:20, 76:2 .
**online** 38:9 .
**open** 40:11, 70:6 .
**opens** 14:20 .
**operating** 20:9 .
**operations** 47:15 .
**opinion** 63:4 .
**opportunity** 11:18, 17:12, 20:6, 22:21, 69:3 .
**oppose** 70:14 .
**opposed** 5:4, 23:3 .
**Opposing** 4:21, 5:2, 5:20, 15:16, 18:24, 27:19, 69:13, 69:22, 70:7, 70:19, 75:21, 77:25 .
**opposition** 18:7, 22:17, 54:7 .
**oral** 10:19 .
**Orchid** 16:13, 16:14, 17:8, 18:13, 18:23, 69:21 .
**order** 4:1, 9:25, 10:18, 10:19, 11:7, 12:3, 50:13, 54:12, 58:15, 66:17, 75:12, 75:17 .
**ordered** 48:21, 53:3, 66:17 .
**Organization** 7:16, 61:16 .
**original** 7:17, 7:21, 29:17 .
**originally** 27:2, 60:23 .
**others** 41:12, 53:18, 65:12, 76:17 .
**Otherwise** 3:4, 17:14, 42:25, 52:7, 58:14 .
**outliers** 28:8, 69:9 .
**outline** 3:8 .
**outside** 61:16 .
**overall** 27:3 .
**overarching** 36:11 .
**overlap** 30:8 .
**overruled** 65:24 .
**overstep** 62:22 .
**owe** 31:1 .
**own** 32:3, 46:23, 47:4, 53:9, 56:8 .
.
.
**< P >** .
**p.m.** 68:25, 78:9 .
**PA** 1:40 .
**packet** 30:23 .
**packing** 52:17, 52:24 .

page 47:8, 54:7, 64:19 .
paid 51:16 .
Pamida 19:2, 19:6, 19:10, 19:15 .
pan 72:3 .
Pandora 70:6 .
paper 72:24 .
papers 46:20 .
paperwork 75:14 .
paragraph 53:10 .
part 8:10, 8:14, 9:6, 16:9, 27:21, 28:7, 36:10, 55:9, 61:21 .
participating 53:25, 54:2 .
particular 5:2, 14:20, 21:8, 30:10, 30:11, 31:24, 32:14, 34:5, 34:6, 34:24, 36:16, 38:1, 38:6, 42:25, 47:2, 47:11, 51:16, 53:18, 55:21, 62:14, 65:14, 65:17, 65:22, 74:1, 75:9, 75:11, 75:15 .
particularized 54:23 .
particularly 44:7, 75:22 .
parties 3:10, 3:13, 13:5, 13:15, 13:21, 13:25, 17:2, 18:25, 20:18, 22:7, 26:9, 36:16, 52:23, 58:7, 60:19, 74:22, 77:3, 77:15, 78:2 .
Partners 16:13 .
party 3:25, 6:4, 6:7, 8:12, 13:3, 13:20, 16:23, 19:11, 54:8, 57:8 .
Patricia 1:47, 78:12, 78:22 .
Pause. 76:14 .
pay 8:17, 8:22, 33:21, 36:6, 49:11, 51:4, 51:6, 60:15 .
payment 31:12, 31:14, 35:19, 35:20 .
PC 2:6 .
pejoratively 7:14 .
penalty 31:2, 52:14 .
pendency 50:17 .
PENDING 1:8, 2:4, 6:8, 14:5, 18:19, 27:4, 33:11, 51:16 .
people 3:2, 13:18, 29:21, 35:3, 55:25, 76:18 .
percent 9:8, 10:18, 12:5, 15:2, 15:7, 29:17, 41:7, 41:8 .
perfectly 58:16 .
Perhaps 17:18, 71:11 .

period 33:15, 45:14, 47:16 .
perjury 31:2, 52:14 .
permanent 28:2 .
permission 38:16 .
permitted 3:3, 19:17 .
perplexed 62:11 .
person 59:23, 60:23, 62:3, 63:12, 63:16, 63:18, 64:12, 64:22 .
personal 10:13, 25:21, 29:21, 53:12 .
personally 73:3 .
persons 49:12, 76:21, 76:23 .
persuaded 4:17 .
persuasive 23:13 .
perverse 58:1 .
Peter 1:5, 1:25, 2:5, 4:3, 13:13, 14:23, 43:23 .
Pharm 15:12 .
pivot 22:15 .
place 14:16, 20:14, 20:16, 22:6, 23:19, 33:2, 41:20, 45:13, 72:6 .
place. 33:4 .
places 32:7, 43:9 .
plain 64:8 .
Plainly 19:9, 44:1, 44:25 .
plaintiff 13:17, 14:7, 19:14, 32:23, 51:13, 54:12, 56:6, 56:7, 57:3, 57:16, 57:19, 61:8, 65:17, 66:2, 67:22, 67:25, 68:1, 74:1, 74:2 .
Plaintiffs 2:8, 13:18, 16:11, 18:3, 18:18, 23:5, 27:2, 27:21, 28:20, 37:7, 42:9, 42:18, 42:22, 43:4, 44:5, 49:9, 50:15, 51:7, 52:11, 54:24, 55:1, 55:10, 58:5, 59:18, 65:20, 66:9, 70:21, 70:22, 76:17 .
plan 9:5, 9:7, 10:1, 15:1, 15:8, 21:25, 34:20, 52:9, 52:10, 72:4 .
plans 52:6 .
play 27:8 .
plays 26:17 .
Please 2:3, 2:8, 75:13 .
podium 5:11, 40:5 .
point 6:18, 14:25, 15:25, 19:5,

20:8, 25:1, 27:8, 30:2, 36:11, 42:21, 46:4, 48:2, 54:6, 54:14, 65:2, 71:4, 72:23, 74:21, 76:15 .
points 18:4, 25:4 .
pool 12:21 .
Porter 46:9 .
portion 52:22 .
position 45:15, 49:16 .
positions 60:20 .
possession 61:10, 63:23, 66:21 .
possibility 14:20 .
possible 5:25, 66:5 .
possibly 3:13, 32:15 .
postponing 70:14 .
potential 13:14, 52:1 .
potentially 58:25 .
powder 33:8 .
practical 42:8 .
practicality 54:11 .
practically 43:10 .
practices 16:5 .
precedent 5:16, 15:12, 22:20 .
precisely 34:8 .
preclude 16:12, 41:21 .
precludes 20:17 .
predecessor 7:3 .
predicted 74:16 .
prefer 77:9 .
preference 23:22 .
prejudice 48:13 .
prejudiced 48:4 .
prejudicial 50:4 .
preliminary 22:11, 22:13 .
premise 66:20 .
preparation 59:20, 59:23, 63:16, 74:23 .
prepare 64:5, 72:9 .
prepared 3:8, 63:19 .
preparing 77:9 .
prepetition 21:17 .
present 33:13, 55:3 .
presented 48:17, 63:19, 66:1, 66:12, 66:16, 74:20 .
presenting 71:8 .
presiding 23:8, 28:4 .
press 4:14 .
Presumably 35:4, 37:25,

56:8 .
**previous** 35:24 .
**previously** 15:20, 16:16,
    56:13 .
**principally** 7:7 .
**principle** 56:22 .
**Prior** 19:13, 20:15, 23:16, 41:1,
    45:22, 46:4, 49:24,
    56:16 .
**privilege** 19:18, 19:21, 56:14,
    58:9, 58:13, 58:22, 59:3,
    64:9, 67:18, 74:20, 74:24,
    75:2 .
**privileged** 15:21, 19:12, 24:3,
    25:12, 51:18, 57:9, 58:25,
    59:5, 59:8, 59:19, 67:16,
    75:1 .
**probably** 27:22, 66:3 .
**probe** 62:17 .
**problematic** 68:5 .
**Procedure** 3:25, 14:8, 17:6,
    20:20, 22:8, 38:19,
    49:20 .
**procedures** 21:24, 75:25 .
**Proceedings** 1:19, 1:43, 78:9,
    78:14 .
**process** 9:16, 14:23, 28:7, 32:21,
    37:18, 62:18, 67:23,
    68:4 .
**Processing** 10:8, 10:9,
    10:10 .
**produce** 50:15, 54:12, 56:17,
    57:5, 73:9, 75:5 .
**produced** 1:44, 29:9, 45:12,
    48:14, 52:18, 56:16, 60:4,
    60:11, 60:24, 63:25, 64:3,
    64:13, 65:5, 65:7, 65:8,
    77:14 .
**producing** 75:12 .
**product** 14:4, 14:17, 14:20,
    16:21, 19:8, 19:12, 19:17,
    19:21, 24:4, 59:5, 59:9,
    61:24, 62:20, 67:17,
    67:24 .
**production** 56:21, 58:13, 59:2,
    64:2, 74:25, 75:1, 77:24 .
**products** 7:7, 7:10, 33:4, 33:7,
    45:20, 47:2, 47:10, 47:15,
    49:10, 49:12, 49:14, 49:25,
    52:7, 53:15, 54:1, 54:4 .

**profession** 64:4 .
**prohibits** 75:20 .
**promise** 10:4, 10:6 .
**prompted** 31:20 .
**proof** 30:23, 30:25, 31:11,
    31:12, 33:17, 35:18,
    49:1 .
**properly** 26:11, 56:20 .
**proposed** 11:10, 21:24, 23:1,
    24:16, 25:23 .
**proposition** 51:25 .
**prosecute** 14:24 .
**protected** 19:20, 24:4, 59:5,
    61:23, 67:16 .
**protecting** 43:7 .
**protections** 19:8, 41:20,
    64:10 .
**prove** 33:17 .
**provide** 21:7, 21:18, 33:13,
    72:7, 75:13 .
**provided** 26:23, 48:1, 48:19,
    56:13 .
**provision** 64:6 .
**public** 37:5, 42:16, 67:5 .
**publicly** 56:15, 56:20 .
**pull** 57:3 .
**Pumps** 49:6 .
**purpose** 2:7, 33:22, 51:25 .
**purposes** 15:22, 18:24, 54:10,
    63:6 .
**pursuant** 21:14, 36:17,
    60:24 .
**pursuing** 44:2 .
**put** 21:19, 41:12, 49:6, 52:5,
    69:23, 74:10, 77:3 .

**< Q >.**
**quash** 3:8, 12:4, 24:9, 42:13,
    77:17 .
**quashed** 10:16, 15:18, 16:2,
    27:18, 40:10, 40:12,
    40:14 .
**question** 4:22, 5:9, 5:16, 5:21,
    6:16, 10:5, 11:3, 14:14,
    16:10, 17:12, 17:17, 19:4,
    28:14, 32:1, 58:17, 61:23,
    63:19, 67:14, 72:11,
    76:10 .
**questioning** 74:17 .

**questionnaire** 48:20 .
**questions** 3:9, 3:12, 3:19, 17:10,
    54:17, 60:1, 68:10 .
**quite** 54:20, 59:21, 63:24,
    64:18 .
**quote** 11:15, 15:19, 27:18,
    52:16, 69:22 .
**quoting** 11:7, 15:15 .

**< R >.**
**R2019** 41:25 .
**raise** 3:15 .
**raised** 3:23, 4:19, 17:24, 28:10,
    28:14 .
**rampant** 27:20 .
**random** 10:17, 28:16, 28:18,
    28:19, 28:22 .
**randomize** 29:19 .
**randomized** 11:11, 12:6,
    12:22 .
**randomly** 11:12, 25:24,
    27:7 .
**rarely** 63:2 .
**rather** 23:11 .
**Re** 1:5, 1:6, 2:5 .
**reach** 61:15, 77:15 .
**reached** 25:14 .
**read** 3:20, 20:13, 22:5, 22:25,
    27:17, 39:15, 41:17, 54:20,
    54:22, 69:17 .
**reading** 3:9, 39:17, 41:18 .
**reads** 52:22 .
**realize** 29:5, 33:8 .
**realized** 62:21 .
**really** 8:20, 25:20, 31:7, 37:8,
    58:3, 63:16 .
**reason** 18:14, 18:18, 29:15,
    31:5 .
**reasonable** 52:15 .
**reasons** 18:5, 25:20, 31:1 .
**receive** 34:5, 34:17 .
**received** 7:23, 76:9 .
**Recess** 68:20, 68:23, 68:24 .
**recognize** 22:22 .
**recognized** 19:16 .
**recognizes** 40:19 .
**recollection** 65:2 .
**recommendation** 35:12 .
**reconstruct** 66:16 .

**record** 2:9, 74:11, 77:4, 77:8,
77:11, 77:14, 77:18,
78:14 .
**recorded** 1:43 .
**records** 26:8, 34:3, 54:21,
73:13 .
**red** 24:21, 28:16, 28:17,
48:22 .
**redact** 76:20, 76:23 .
**reduce** 11:14 .
**Redwell** 73:3 .
**reference** 4:12, 4:13, 43:24 .
**referral** 67:9 .
**referring** 43:23, 57:19 .
**refers** 68:1 .
**reflect** 58:5 .
**reflecting** 60:20 .
**reflection** 75:9 .
**refreshed** 65:1 .
**refuse** 43:8 .
**regard** 14:19, 76:16 .
**regarding** 4:17, 4:20, 14:3,
19:13, 22:1, 54:17,
74:20 .
**regardless** 26:17, 43:15 .
**regular** 73:4 .
**regularly** 45:19, 50:19 .
**reissued** 12:2 .
**reject** 22:25, 52:10 .
**rejected** 25:3 .
**rejecting** 47:20 .
**relate** 25:13 .
**related** 19:4, 24:5, 50:4, 54:15,
58:4, 76:3 .
**relates** 13:24, 67:12 .
**relating** 5:5, 23:12, 25:21 .
**relationship** 15:22, 35:10 .
**relatively** 74:21 .
**released** 52:17, 52:24 .
**relevance** 31:9, 33:18,
52:22 .
**relevant** 4:2, 6:2, 13:3, 14:4,
21:16, 21:17, 21:21, 31:7,
32:22, 36:11, 40:13, 40:19,
44:8, 44:25, 50:23, 57:18,
67:19, 76:1 .
**reliable** 21:18 .
**relied** 47:20, 71:8 .
**relies** 18:15 .
**rely** 22:19, 42:5, 77:4,

77:11 .
**relying** 77:8 .
**remain** 3:4 .
**remaining** 23:3, 73:25,
76:21 .
**remains** 48:3 .
**remember** 15:2 .
**remove** 3:3, 3:5 .
**reorganization** 9:5, 10:1, 10:2,
52:2 .
**repeat** 18:17 .
**repeatedly** 50:3 .
**repeating** 46:21 .
**reply** 4:4, 47:22, 49:8, 49:19,
53:6 .
**Reporter** 1:48, 78:23 .
**repository** 32:4 .
**represent** 14:8, 15:20, 18:25,
33:9, 36:20, 67:25 .
**representation** 13:25, 53:8,
55:23, 56:2, 67:10, 73:20,
76:2 .
**representative** 43:21,
71:14 .
**represented** 14:5, 15:21,
44:17 .
**representing** 46:17, 57:16,
58:11, 61:13 .
**represents** 17:1, 36:16, 36:19,
67:21 .
**request** 42:15, 42:17, 43:9, 54:9,
54:23, 55:8, 56:21, 61:5,
64:5, 67:11 .
**requested** 11:14, 13:24, 19:16,
74:21, 75:7, 75:22, 76:8 .
**requesting** 54:18, 54:25,
55:11 .
**requests** 18:9, 19:25, 21:2,
54:19, 55:10 .
**require** 5:1, 32:22, 35:18, 38:17,
49:13, 50:6, 50:24, 52:5,
54:20, 55:6, 55:9, 59:2,
59:24, 74:25, 75:1, 76:1 .
**required** 23:6, 46:14,
74:23 .
**requires** 8:19, 8:21, 38:15,
49:21, 50:12 .
**reserve** 3:18 .
**resolution** 23:15 .
**resolved** 6:19, 11:8, 11:9, 11:10,

11:13, 11:15, 11:18, 11:25,
12:11, 24:14, 24:17, 51:16,
75:11, 78:4 .
**respect** 4:22, 21:11, 37:11, 42:9,
42:13, 55:14, 58:17, 59:17,
64:1, 67:5, 75:19, 77:5 .
**respond** 17:13, 24:16, 25:7,
27:14, 55:15 .
**responded** 54:14 .
**Responding** 40:21, 53:2,
57:23 .
**response** 10:23, 42:6, 50:5, 50:8,
60:4, 61:23, 67:14, 71:16,
71:21, 71:22 .
**responses** 3:12, 40:8, 48:7,
65:18 .
**responsible** 47:3 .
**responsive** 58:14, 73:9 .
**restricted** 37:3, 37:4, 37:5,
37:12, 37:20, 38:5, 38:7 .
**restricting** 12:13 .
**restriction** 38:14, 38:15, 39:11,
42:3, 42:4, 75:15 .
**restrictions** 77:7 .
**restructuring** 7:12, 8:10 .
**result** 33:10 .
**resulted** 8:2 .
**returned** 15:9 .
**reveal** 68:2 .
**review** 42:17, 54:7, 60:23, 62:1,
62:4, 64:12, 64:23,
74:22 .
**reviewed** 54:11, 72:1 .
**reviews** 59:24 .
**Richard** 1:39, 2:21 .
**rightly** 18:4 .
**rise** 68:22, 78:7 .
**risk** 25:22, 40:15 .
**RMR** 1:47, 78:12 .
**road** 13:5 .
**Robinson** 1:40, 2:22 .
**roll** 65:16 .
**rolling** 13:5 .
**room** 69:17 .
**Rosenberg** 1:37, 2:20, 2:25 .
**roughly** 27:7 .
**routine** 50:7 .
**routinely** 49:4, 50:2 .
**Rule** 3:18, 3:25, 4:2, 17:25,
18:1, 19:22, 20:17, 20:18,

20:22, 21:1, 21:3, 21:12, 21:14, 22:15, 29:6, 36:14, 36:17, 38:1, 41:16, 43:13, 53:6, 53:7, 53:9, 53:17, 54:13, 55:3, 64:16, 75:8, 75:12 .

**Rules** 3:1, 20:20, 58:1 .

**run** 3:11 .

**running** 43:17 .

**Ruther** 1:36, 2:24 .

.

.

**< S > .**

**Safeway** 56:18 .

**Salem** 2:12 .

**sample** 6:19, 10:17, 11:8, 11:10, 11:13, 11:15, 11:18, 12:1, 12:11, 12:22, 23:21, 24:14, 24:17, 25:23, 25:24, 28:16, 28:18, 28:23, 48:17, 48:18, 48:20 .

**sample.** 11:9 .

**sampling** 26:3, 27:15 .

**sanctions** 46:25 .

**satisfied** 19:10, 77:8 .

**saying** 22:11, 25:11, 30:21, 34:10, 37:18, 38:21, 62:21, 71:20 .

**says** 25:20, 26:10, 30:25, 35:13, 36:18, 41:17, 55:5, 69:23 .

**scheduled** 9:17 .

**science** 14:19 .

**scope** 54:18, 61:12 .

**screen** 46:4, 49:22 .

**seal** 38:17 .

**sealed** 38:7, 38:20 .

**search** 55:13, 73:12, 73:22 .

**searches** 54:21, 55:6, 55:7, 60:7, 62:1, 73:7 .

**seated** 2:3 .

**second** 5:3, 6:2, 47:22 .

**secondary** 19:2 .

**secret** 50:19 .

**section** 62:10 .

**seek** 18:2, 19:20, 51:24, 54:8 .

**seeking** 5:1, 5:5, 5:20, 10:17, 16:19, 18:14, 19:11, 19:14, 21:3, 21:7, 26:2, 26:8, 26:21,

28:21, 36:11, 54:8, 58:15, 61:12, 64:7, 65:10, 66:24 .

**seeks** 11:19, 14:3, 16:3, 16:17, 24:2, 46:20 .

**seeks.** 22:4 .

**seem** 58:23, 66:3 .

**seems** 3:10, 59:18 .

**seen** 28:6, 44:7 .

**Select** 25:24, 40:8 .

**selected** 11:12, 12:18, 18:17, 27:1, 27:7, 29:11, 42:9, 42:18, 42:21, 44:5, 51:7, 51:12, 52:11, 54:24, 55:1, 55:10, 56:5, 56:6, 57:3, 58:4, 59:18, 65:20, 66:9, 67:22, 74:1, 74:2 .

**selective** 16:11, 18:3 .

**sell** 7:9 .

**selling** 53:14 .

**seminal** 5:18 .

**send** 42:24 .

**sense** 16:24, 40:13, 40:14, 69:9 .

**sentence** 14:13 .

**separate** 27:6, 42:11, 42:13, 48:22, 62:10, 73:8 .

**series** 3:9, 14:18 .

**serve** 37:14, 42:11 .

**served** 11:21 .

**serves** 41:5 .

**serving** 56:19 .

**session** 69:13 .

**set** 10:3, 18:7, 29:10, 29:12, 33:22, 38:18, 39:11, 50:14, 56:11, 56:24 .

**settle** 37:10, 45:8 .

**settled** 26:22, 45:4, 45:5, 48:12, 48:14, 65:6, 66:7, 70:16 .

**settlement** 23:9, 59:16, 60:10, 60:13, 60:18, 60:20, 60:25, 61:7, 62:6, 70:1, 72:17, 72:18, 73:23 .

**settlement-based** 47:21 .

**settlements** 21:18, 23:4, 25:14 .

**settles** 65:3 .

**seven** 9:20, 16:19, 26:8, 27:3, 28:24, 29:1, 42:22, 55:10, 55:24, 55:25, 65:20, 76:17,

76:19, 76:24 .

**several** 10:11, 70:16, 74:13 .

**share** 32:18 .

**Shelton** 4:20, 4:24, 5:17, 5:19, 6:5, 13:9, 15:18, 16:7, 16:12, 16:15, 17:8, 17:19, 17:24, 17:25, 18:6, 18:8, 18:9, 18:18, 19:4, 19:7, 20:2, 26:20, 69:19, 75:19, 75:20, 76:5 .

**short** 5:15, 40:23 .

**show** 9:10, 13:5, 19:7, 31:5, 37:8, 37:9, 46:23, 51:11, 55:19, 63:17, 71:2 .

**showed** 45:18 .

**showing** 21:15, 49:20, 63:10, 63:20, 65:8, 71:18 .

**shows** 47:9 .

**shut** 17:9 .

**side** 14:25, 20:9, 72:8 .

**sides** 6:12, 23:25 .

**signed** 31:2, 45:18 .

**significance** 25:25, 47:11, 48:16, 52:21, 53:8, 63:14, 74:13 .

**significant** 15:11, 22:22, 44:19, 45:3, 47:18, 53:24, 63:4, 74:18, 76:4 .

**significantly** 70:24 .

**Similar** 15:17, 21:2, 58:17, 63:25 .

**Similarly** 67:5 .

**simple** 18:20 .

**simpler** 59:4 .

**simplest** 43:11 .

**Simply** 19:5, 34:19, 35:20, 37:13, 52:5 .

**Sir** 46:13 .

**sit** 20:3, 38:13, 61:8 .

**site** 32:24, 32:25, 33:12, 33:15, 49:17 .

**sitting** 38:9 .

**situation** 5:21, 13:10, 58:18, 69:20 .

**Six** 16:19, 27:2, 27:3, 28:22, 46:8, 47:16 .

**size** 15:3 .

**skip** 16:6 .

**slide** 46:3, 47:6, 47:11, 49:7, 50:10 .

**sliver** 23:18 .

**sold** 7:6, 52:19 .

**Somebody** 32:19, 32:20, 35:13, 37:15, 38:16, 63:10 .

**somehow** 27:20, 40:25, 51:3 .

**someone** 3:14, 32:13, 39:5, 39:12, 39:13, 61:13 .

**sometimes** 35:6 .

**somewhere** 43:7, 56:23 .

**sons** 43:23 .

**soon** 46:2 .

**sorry** 64:18 .

**sort** 3:11, 4:25, 5:24, 13:11, 14:12, 14:25, 20:6, 24:14, 54:17, 57:10, 59:22, 60:14, 61:22, 62:10, 66:15, 66:16, 66:18, 66:19, 77:7 .

**sorts** 61:19 .

**sought** 6:1, 10:13, 15:15, 18:22, 21:5, 21:15, 25:21, 29:13 .

**sounds** 7:13, 24:16, 68:19 .

**speaking** 3:2, 3:3, 20:17 .

**specialized** 10:2 .

**specially** 12:17, 27:1 .

**specific** 54:17, 68:10 .

**specifically** 8:23, 19:3, 30:22, 60:22, 74:25 .

**specifics** 19:25 .

**specifying** 53:14, 56:12, 58:16 .

**spend** 43:17 .

**spreadsheet** 29:10 .

**spreadsheets** 25:11 .

**stage** 20:24, 22:12, 22:13 .

**stand** 69:11 .

**standard** 4:20, 48:25, 53:17, 76:6 .

**standards** 19:10, 19:18 .

**stands** 68:22, 78:8 .

**start** 3:22, 17:19, 66:19 .

**state** 22:22, 40:10, 49:4 .

**stated** 40:11 .

**Statement** 36:15, 36:22, 46:6, 52:4 .

**statements** 19:23, 37:3, 38:1, 41:16, 42:14, 42:18, 43:14, 50:16, 53:6, 53:7, 53:24, 54:5, 54:8, 54:13, 55:3,

64:16, 67:6, 69:11, 69:25, 74:8 .

**STATES** 1:1, 23:7, 32:3, 47:23, 50:6 .

**stating** 74:25 .

**statistical** 25:23, 25:25, 26:3 .

**status** 51:11, 51:15, 55:19, 55:24 .

**statute** 9:7 .

**steers** 20:18 .

**stenographic** 78:14 .

**stenography** 1:43 .

**step** 17:21, 25:5, 39:17 .

**STEPHANIE A. GALLGHER** 1:21 .

**stop** 14:12, 62:2 .

**stopped** 40:23 .

**straightforward** 59:19 .

**strategies** 16:5, 16:17 .

**strategy** 18:12, 24:5 .

**Street** 1:49 .

**study** 70:22 .

**stuff** 39:19 .

**subject** 8:11, 13:12, 18:11, 56:20, 59:8, 62:10 .

**submissions** 51:25 .

**submit** 35:15, 35:18 .

**submitted** 34:5, 47:24, 49:5, 50:16 .

**subpoena** 10:7, 10:12, 10:16, 10:17, 12:4, 13:13, 16:2, 24:2, 24:23, 24:24, 25:7, 25:18, 29:24, 40:10, 40:12, 42:6, 42:13, 42:22, 44:10, 51:11, 60:4, 60:11, 60:25, 77:18 .

**subpoena.** 12:6 .

**subpoenaed** 15:19, 15:23, 29:9, 30:1, 30:5, 30:6 .

**subsequent** 10:19, 63:7 .

**substance** 60:14 .

**substantiate** 35:19 .

**successful** 42:17, 52:2 .

**suffice** 55:14 .

**sufficient** 51:3, 51:11, 55:19 .

**sufficiently** 21:25 .

**suggest** 19:6, 70:5 .

**suggesting** 41:16, 75:10 .

**suggestion** 40:21 .

**summarize** 50:5 .

**summarized** 50:7 .

**supplement** 50:18 .

**supplied** 52:18 .

**support** 46:6, 48:5, 49:15, 52:3 .

**supported** 44:11, 47:3 .

**supposed** 25:17 .

**survived** 14:14 .

**switched** 22:10 .

**system** 10:10, 13:21, 13:22, 15:9, 15:10, 34:1, 65:11, 65:13, 73:6 .

**system.** 64:21 .

**Systems** 16:13, 73:16 .

.

.

**< T >.**

**talked** 27:19, 55:18, 70:8, 70:19 .

**tangentially** 26:7 .

**tecum** 10:7 .

**tells** 39:16 .

**ten** 12:5, 28:3, 29:17, 72:5 .

**ten-minute** 68:17, 68:20 .

**term** 34:16 .

**terms** 3:2, 3:19, 7:13, 18:9, 19:25, 29:8, 59:20, 63:25, 64:11, 64:22, 74:22, 74:23, 75:12, 75:16, 76:4, 76:6, 77:14 .

**test** 6:5, 15:18, 16:15, 17:8, 26:20 .

**testimonial** 4:21 .

**testimony** 5:1, 5:4, 48:7 .

**Texas** 7:12, 7:14, 7:15, 8:14, 33:10 .

**themselves** 37:10 .

**theory** 55:6, 57:11 .

**thereafter.** 50:18 .

**they'll** 29:6, 38:13, 71:2 .

**They've** 12:7, 28:12, 28:18, 73:16 .

**thinking** 61:22 .

**Third** 5:4, 6:3, 10:20, 26:16, 29:3, 29:5, 53:5, 58:7 .

**Thomas** 1:27 .

**though** 13:23, 16:11, 19:19, 29:6, 29:7, 61:17, 66:11,

69:19 .
**thousands** 52:10 .
**three** 4:25, 5:20, 6:1, 11:21, 16:7, 24:2, 27:4, 28:21, 52:11, 70:21, 70:22, 72:15 .
**throughout** 22:23, 44:21 .
**thrust** 21:3 .
**tie** 9:9 .
**timing** 77:24 .
**Title** 9:6 .
**today** 3:18, 4:11, 4:15, 13:5, 13:8, 24:22, 40:11, 48:17, 74:18, 76:4, 77:7, 77:18 .
**toes** 25:5 .
**Tom** 2:11 .
**took** 8:7, 20:14, 45:13 .
**top** 7:2 .
**tort** 7:25, 8:21, 9:3, 15:10, 24:5, 25:16, 26:22, 43:25, 46:19, 47:13, 47:17, 54:1, 57:15, 57:17, 57:18, 57:20, 64:20, 65:11, 65:12, 67:22 .
**torts** 8:6 .
**trade** 8:8 .
**Transaction** 16:13 .
**TRANSCRIPT** 1:19, 1:43, 20:14, 71:13, 71:19, 71:25, 78:13 .
**transcripts** 63:9, 66:2, 66:17 .
**treated** 9:25 .
**tremendous** 30:8 .
**trial** 18:10, 25:15, 44:18, 45:16, 45:17, 48:15, 50:14, 66:1, 66:2, 66:12, 66:16, 66:17, 70:14, 71:12, 71:15, 71:19, 71:25 .
**tried** 12:7, 34:9 .
**true** 48:2, 69:8 .
**Trusts** 10:11, 10:14, 21:1, 21:2, 21:12, 21:14, 30:11, 31:24, 32:2, 41:6, 42:12, 42:24, 46:18, 47:3, 49:5, 49:11, 50:24, 51:4, 51:6, 51:7 .
**try** 28:8 .
**trying** 17:22, 26:24, 27:6, 32:17, 38:25, 39:10, 56:9, 57:12, 57:24, 58:3, 60:5, 61:20, 66:14, 71:9, 72:2 .

**turn** 20:12, 40:8, 41:24, 42:6 .
**Turning** 48:16, 51:23 .
**Two** 7:17, 7:19, 7:20, 8:1, 10:6, 10:20, 18:25, 28:25, 29:1, 39:25, 40:18, 44:18, 46:5, 58:23, 69:8 .
**two-step** 7:15, 33:10 .
**type** 10:1, 10:2, 21:6, 22:10, 29:13, 29:24, 30:7, 34:10, 38:14, 38:15, 47:9, 58:17, 59:2 .
**types** 25:9, 47:9, 72:15, 72:20 .
**typically** 51:15 .

.

**< U >** .
**UCC** 45:15 .
**underlying** 25:16, 43:6 .
**underpinning** 44:9 .
**underscoring** 52:21 .
**understand** 7:14, 27:6, 32:11, 37:7, 39:11, 57:8, 69:16, 71:9, 73:20 .
**understanding** 42:21, 72:21, 74:3 .
**understood** 26:25, 27:12, 72:18 .
**undertake** 55:14 .
**underwent** 7:11 .
**Union** 44:12, 44:20, 45:5, 45:11, 45:25, 46:1, 46:25, 48:15, 65:7, 65:8, 70:15 .
**UNITED** 1:1 .
**universally** 15:16, 49:13 .
**unless** 17:9, 68:10 .
**unlike** 19:11, 48:25 .
**unliquidated** 53:11 .
**unrelated** 24:25, 25:1 .
**until** 45:15, 68:23 .
**unusual** 37:2 .
**unvaccinated** 3:6 .
**urge** 31:8 .
**urged** 69:20 .
**uses** 14:24 .

.

**< V >** .
**V.** 13:19, 15:12, 16:13, 44:12,

49:6, 56:18 .
**vaccinated** 3:5, 4:7 .
**vaguely** 47:23 .
**valid** 43:8, 56:21 .
**value** 57:25 .
**various** 3:12, 10:12, 41:20, 42:12, 63:9, 75:6 .
**varying** 53:11 .
**vast** 8:15 .
**verified** 36:21 .
**Versions** 32:8, 77:6 .
**versus** 2:6, 39:5, 57:16 .
**viability** 23:3 .
**viable** 24:18 .
**victims** 14:8, 33:23 .
**view** 20:10, 32:16, 42:2, 57:21, 58:1, 75:19 .
**viewed** 21:8 .
**violating** 75:16 .
**virtue** 40:25 .
**Vital** 15:12, 26:20 .
**Volta** 47:22 .
**vote** 15:7, 35:6, 35:20 .
**voted** 52:10 .
**voting** 52:6 .

.

**< W >** .
**W.** 1:27, 1:49 .
**waived** 19:8 .
**Wall** 1:28, 2:11 .
**wanted** 3:14, 4:5, 9:10, 11:2, 27:11, 36:13, 38:21, 40:14, 42:23, 74:7 .
**wants** 9:23, 20:3, 37:13, 39:21 .
**Warfield** 28:25, 44:5, 44:11, 44:15, 44:17, 45:7, 45:10, 45:18, 45:21, 45:23, 46:5, 46:9, 46:12, 46:16, 46:21, 46:23, 47:1, 47:4, 47:5, 47:24, 47:25, 48:5, 52:12, 65:6, 70:8, 70:10, 70:12, 70:18 .
**way.** 35:14 .
**ways** 35:8, 35:9, 74:18 .
**website** 32:24 .
**weeks** 10:20 .
**weigh** 71:12 .
**weird** 13:21 .

**Welcome** 2:13 .
**Western** 1:9, 6:25, 11:6, 23:19 .
**Westlaw** 15:13 .
**Whatever** 29:11, 41:7, 51:21, 75:14 .
**whence** 15:10 .
**whenever** 50:15 .
**whereas** 38:16 .
**Whether** 3:17, 4:23, 12:20, 12:21, 21:17, 26:1, 28:13, 31:12, 32:22, 33:20, 33:24, 34:17, 36:3, 38:19, 39:11, 39:13, 41:24, 42:18, 43:16, 48:10, 50:21, 52:9, 56:14, 56:15, 62:13, 62:16, 65:14, 71:7 .
**whichever** 57:3, 73:24 .
**whoever** 71:6 .
**whole** 34:1 .
**whom** 57:19 .
**Wilcox** 46:10 .
**William** 44:16 .
**willing** 59:7 .
**Willis** 49:6 .
**Winston** 2:11 .
**wish** 27:14, 77:5 .
**wish.** 26:11 .
**without** 45:7, 45:8, 64:6 .
**witness** 59:20, 59:22, 71:2, 71:5, 71:6, 72:2, 74:24 .
**wondered** 68:16 .
**word** 58:9 .
**words** 12:3, 51:21, 55:21, 55:22, 70:8 .
**Worf** 1:39, 2:21 .
**work** 14:4, 14:16, 16:21, 19:8, 19:12, 19:17, 19:21, 24:4, 33:2, 59:5, 59:9, 61:24, 62:19, 67:17, 78:3 .
**worked** 33:15, 73:17 .
**working** 14:17, 66:24 .
**works** 10:24, 10:25, 41:7 .
**world** 69:10 .
**worried** 55:4 .
**writing** 5:8, 40:11, 77:4 .
**written** 29:1, 70:20 .
**wrote** 68:15, 70:23 .
.
.

**< Y >** .
**year** 9:17, 9:18, 10:3, 11:5, 29:2, 47:15, 47:16 .
**years** 9:20, 10:6, 14:18, 28:3, 28:4, 43:17, 44:17, 47:12, 47:16, 54:21, 70:21, 73:18 .
**yourself** 2:8 .